THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* HARRY POSNER, Appellant.

Argued January 15, 1937; decided March 9, 1937.

*Samuel J. Ohringer* for appellant. Defendant acted as a dealer, not as a broker, and the People failed to prove him guilty of bucketing and violating section 390 of the Penal Law. (*Wills* v. *Investors Bankstocks Corp.*, 257 N. Y. 451; *Matter of Bankers Capital Corp.*, 51 Fed. Rep. [2d] 737; *Levy* v. *Leonard*, 231 App. Div. 763; *Wilson* v. *Morley*, 236 App. Div. 546; *People* v. *Crossman*, 241 N. Y. 138; *Johnson* v. *Winslow*, 155 Misc. Rep. 170; *Coolidge* v. *Old Colony Trust Co.*, 259 Mass. 515; *Broderick* v. *Aaron*, 153 Misc. Rep. 791; *Leahy* v. *Lobdell, Farwell & Co.*, 80 Fed. Rep. 665; *Pimpinello* v. *Swift & Co.*, 253 N. Y. 159; *Community Nat. Corp.* v. *Kahle*, 233 App. Div. 334.)

*Charles P. Sullivan*, District Attorney (*John H. W. Krogmann* of counsel), for respondent. The defendant was proven guilty of a violation of section 390 beyond a reasonable doubt. (*People* v. *Crossman*, 241 N. Y. 138.) The evidence of other transactions testified to was properly received. (*People* v. *Molineux*, 168 N. Y. 264; *People* v. *Miller*, 169 N. Y. 339.)

CRANE, Ch. J. The defendant has been convicted of a violation of section 390 of the Penal Law. The indictment charged the defendant Harry Posner, as manager of H. G. Woods & Co., Inc., of having made a contract with one Rowan to purchase for her ten shares of Standard Brands stock at $20 per share, totaling $200, and accepting $100 in part payment, intending that such contract was to be terminated, closed and settled on the basis of market quotations, without intending a *bona fide* purchase and sale of the same.

Another count, alleging the same facts, charged him with keeping, conducting and operating a bucket shop.

Mrs. Rowan testified that through agents and representatives of H. G. Woods & Co., which had an office in Jamaica, Long Island, she bought ten shares of Standard Brands stock at $20 a share and gave her check for $100 in part payment. She says the firm was to sell it at a profit for her; that about three days later the man with whom she did business stated that the stock had gone up eight points and he would sell it. She told him to sell the ten shares and buy Elko Chief gold mine stock, 400 shares, on which she was given a credit of $200 on account, and gave to Woods & Co. an additional check for $400. The testimony is the following:

" Q. Did you send them a check for $400 to pay for the Elko Chief gold mine stock? A. Yes, your Honor; that is the check.

" Q. Did you ever get the stock? A. Yes; I have the stock right here.

" Q. Have you got that certificate of stock, the Elko Chief gold mine stock with you? A. I have, yes."

Keeping in mind that the charge against the defendant was the violation of section 390 of the Penal Law, which prohibits a broker from taking customers' orders and failing to execute them, intending to settle on the rise or fall of the stock market quotations, we are of the impression that incompetent evidence was received against the

defendant to such an extent that the jury was inclined to believe, in fact could not help but believe, that the defendant was charged with and guilty of failing to make *delivery* of the stock purchased. Thus, Mrs. Rowan was asked on direct examination by the District Attorney: "Q. Did you ever receive any shares of Standard Brands stocks? A. I never did; never did."

This in itself might not have been incompetent testimony, or at least might have been disregarded even if it were incompetent, were it not for other evidence of like nature, received from other witnesses who were customers. Mrs. Rowan did not receive the Standard Brands stock because she never asked for it and had never paid the balance due on it. She told Woods & Co. to sell it and put the money in Elko Chief gold mine stock, the certificate of which she later received. She may have been cheated in taking stock of little or no value, but this is not the crime with which the defendant is charged.

Other customers were called as witnesses to show their dealings with Woods & Co. or with the defendant. Woods & Co. was the defendant. He was doing business in the name of the corporation; he was the owner of the business. These witnesses were called for the purpose of showing a scheme of the defendant to carry on a bucket shop or brokerage transactions which were fictitious in that no stocks were bought, the intention being to settle according to market quotations. The witnesses, however, were questioned for the purpose of showing that the stocks which they ordered or bought were never received. The fact is that these witnesses bought stock or ordered stock on margin and were not entitled to receive it until they paid the balance. This they never did.

Mrs. Mary Duggan on May 15, 1933, purchased through H. G. Woods & Co. ten shares of General Motors stock at $23 a share.

"Q. Now, Mrs. Duggan, when you purchased these ten shares of General Motors at $23 a share and paid $100 on

account — did you pay $100 on account? A. Yes, sir.

" Q. Did you ever receive the delivery of the 10 shares of General Motors stock? A. I did not."

There is nothing to show that she was entitled to receive this stock or that she had paid the balance due on it.

Mrs. Mary Dwan testified:

" Q. How much did you pay on account of that purchase of 10 shares of General Motors to H. G. Woods & Co.? " to which no answer was made; but the following questions were asked by the court:

" Q. Did you receive a confirmation?

" Q. Did you receive this paper? A. I received that.

" Q. Before you received that had you paid $100 on account of the ten shares? A. Yes, sir.

" Q. On June 2nd, 1933, did you purchase from H. G. Woods & Co., 20 shares of General Motors at 25 3/4 a share? A. Yes, sir.

" Q. And also 10 shares of General Motors at 27 3/8 a share? A. Yes, sir.

" Q. Did you receive these two confirmations upon the purchase of the 30 shares of General Motors? A. Yes, sir.

" Q. How much did you pay H. G. Woods & Co. at that time? A. The boy came to my house and I paid him at different times; I paid him $200 one day and in a few days I gave him $200 again.

" Q. Did you ever receive at any time delivery of the General Motors stock? A. Never."

The fact is the stock cost $770 and she only paid $400 on it. She was not entitled to receive the certificates and yet the jury by these questions was led to believe that the defendant did something wrong in not delivering to her the General Motors stock.

Anna Bartel testified: " Q. Mrs. Bartel, on June 12th, 1933, did you purchase from H. G. Woods & Co., 10 shares of Standard Brands at 20 3/4 a share? A. I did."

She received a letter from H. G. Woods & Co., marked in evidence, which reads as follows:

" Miss ANNA BARTEL
3729–78th Street
Jackson Heights.

" Dear Miss BARTELL: We desire to acknowledge with thanks receipt of your order for 10 shares of Standard Brands at 20 3/4 together with check for $100 on account thereof.  Thanking you for this item of business, we beg to remain

" Very truly yours,
" H. G. WOODS & CO."

She then testified:

" Q. Miss Bartel, did you give H. G. Woods & Co. the sum of $100 as mentioned in this letter June 12th?  A. I did.

" Q. Did you ever receive delivery of the 10 shares of Standard Brands from this H. G. Woods & Co. or anybody else?  A. I did not.

" Q. You may examine."

This witness was called for no other purpose than to prove that she did not get the stock she purchased.  This is all of her testimony.  For what purpose was it offered?  She was not entitled to receive her stock until she had paid for it, and she had only paid $100 on account.

Some of these questions were not objected to, but exceptions were taken to this line of proof and the receiving in evidence of these other transactions.  These we deem sufficient to raise the point in question.  While it may be that other similar transactions can be shown in a case like this in order to prove that a broker is maintaining a bucket shop and carrying on the business of broker through fictitious purchases and sales, yet the evidence must be confined to the charge.  The repeated questions put to customers showing that they had not received the stock which they had purchased, when in fact they had

not paid for it and were not entitled to receive it must necessarily, in our judgment, have led the jury to believe that the failure to deliver was a wrongful act, or at least part of the crime with which the defendant had been charged.

There is evidence which would justify a jury in believing the defendant to be guilty of the crime charged. The testimony of Posner before the Attorney-General and of his associate, Harold G. Woods, on the trial of this case would lead one to believe that the authorities were right in prohibiting him from carrying on his business; yet we must give to any defendant the right to be tried for the crime with which he is charged, and upon evidence proving or tending to prove that crime, uninfluenced by irrelevant facts and circumstances which tend to prejudice or mislead the jury. Issues must be left clear, not smothered or in a haze. There are other errors which we have considered, but the one here stated is sufficient to explain why we are obliged to reverse this conviction and send the case back for a new trial.

The judgment should be reversed and a new trial ordered.

LEHMAN, O'BRIEN, HUBBS, LOUGHRAN and RIPPEY, JJ., concur; FINCH, J., taking no part.

Judgment reversed, etc.