David L. Malbin, J.
On the 23rd day of April, 1964, shortly after midnight, a nurse returning from her duties at a Brooklyn hospital was on her way home in the East New York area of Brooklyn and was alleged to have been attacked by a culprit who attempted to commit a forcible act of rape upon her. The defendant was arrested on the following morning and was identified as the victim’s assailant. Widespread publicity, through the media of newspapers, television and radio, was given to the circumstances relating to the apprehension of the alleged perpetrator of the crime. (It may be mentioned at this time that the defendant was also charged with the commission of three unrelated murders.) This report was widely circulated throughout the city and the United States.
Subsequently, on the 5th day of May, 1964 the defendant was indicted for the crime of attempted rape in the first degree and assault in the .second degree with intent to commit the crime of rape in the first degree. His trial was commenced November 9, 1964 and was concluded November 18, 1964, at which time the jury returned a verdict of guilty of the aforesaid crimes charged *508 in the indictment. Pursuant to sections 2189-a and 243 of the Penal Law, the defendant was committed to Kings County Hospital for psychiatric examination and probation report. Sentence was set for January 11,1965.
The present application was made on January 7, 1965 and sentence was deferred pending its determination. This is a motion to set aside the verdict of the jury and to grant a new trial in accordance with section 465 of the Code of Criminal Procedure. Briefly summarized, the grounds urged in support of this motion are as follows:
(1) “ Verdict is against weight of the evidence and contrary to law.” (2) “ Sections 662-662a-662b of the Code of Crim. Pro. were violated, thereby depriving the court of jurisdiction.” (3) “ Defendant’s constitutional rights were violated in conducting this trial, before disposing of an indictment charging murder in the first degree.” (4) ‘‘ Defendant was deprived of a fair trial because of jury misconduct.” (5) “ Defendant’s rights were violated because of alleged widespread publicity of statements issued by the police and district attorney.” (6) “ Defendant was not arraigned within a reasonable time, thereby violating his constitutional rights.” (7) “ The misconduct of the jurors during the trial and violating admonitions of the trial court; the verdict was influenced by racial bias.” (8) “ The newly discovered evidence in that the district attorney withheld evidence that was or may have been favorable to the defendant.”
After oral arguments, the court deemed the charges of sufficient severity to order a public hearing. When the application is based on such conduct that prejudices the substantial rights of the defendant, the court has inherent power, in the interests of justice, to conduct an examination (People v. Leonti, 262 N. Y. 256). It is a right secured by the Constitution and statutes of the State and essential to justice, that an accused person shall be judged by a jury upon the evidence received by the trial court in open court and in the presence of the accused. (People v. Sprague, 217 N. Y. 373, 380.) The law is extremely tenacious of this cardinal doctrine.
Preservation of our time-honored system of a trial by jury should not be weakened by condemnation of the actions of a jury by accepting baseless or unsupported accusations. However, after a jury has returned a verdict (as in the case at bar) and a request was made for a hearing to determine whether or not the actions and the conduct of the jury during deliberations were such as to deprive the defendant of his constitutional rights, then an inquiry must be made predicated on various factors.
*509 Was there any claim of concealment or misstatement by a juror during the voir direí; if there was, then the trial was initiated on a false premise, and consequently the defendant was not afforded a fair and impartial trial; the circumstances may indicate that he was deprived of his constitutional rights which could affect the entire proceeding; a trial before a biased jury is unfair and is no trial at all; it constitutes a denial of due process.
A talesman who conceals his prejudice and carries it into the jury room violates Ms oath of office and commits an injustice; and makes a mockery of our treasured tradition of a fair trial. Judge Cabdozo said: “ If the answers to the questions are wilfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only.” (Clark v. United States, 289 U. S. 1,11.) The action of the juror taints the trial in its origin. It destroys the very foundation of our democratic processes and makes the trial a farce.
Assuming that an examination of the talesman could disclose any prejudice on the part of the jury, counsel would have the right to challenge for cause such juror pursuant to section 376 of the Code of Criminal Procedure, which states in part the following: “ [f]or the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that such juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging, and which is known in this Code as actual bias. But the previous expression or formation of an opinion or impression in reference to the guilt or innocence of the defendant, or a present opinion or impression in reference thereto, is not a sufficient ground of challenge for actual bias, to any person otherwise legally qualified, if he declare on oath, that he believes that such opinion or impression will not influence his verdict, and that he can render an impartial verdict according to the evidence, and the court is satisfied, that he does not entertain such a present opinion or impression as would influence his verdict.” The opposition to a juror that has formed an opinion before hearing any evidence is a valid one, when his opinion would require evidence to remove. (People v. Carpenter, 38 Hun 490, affd. 102 N. Y. 238; People v. Mahoney, 73 Hun 601.)
No challenge on the voir dire was made to the court; the contention raised by the defense is that subsequent events led to the discovery of the alleged prejudicial conduct during the trial and the deliberations of the jury. These facts pose a very serious problem. Does a defense claim justify a public hearing? *510 The arguments and votes of jurors are secrets protected from disclosure unless the privilege is waived. The origin of the privilege comes from ancient usage and is strongly defended by public policy. The danger from disclosure as to what happens in a jury room might stifle freedom of debate and independence of thought if the jurors were made to feel that their arguments and ballots were to be freely published to the general public. The force of these considerations is not to be weighed lightly.
In Clark v. United States (289 U. S. 1,13-14) the court stated: “ [T]he recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process. The function is the more essential where a privilege has its origin in inveterate but vague tradition and where no attempt has been made either in treatise or in decisions to chart its limits with precision. * * * It is sufficient to mark the one that is decisive of the case at hand. The privilege takes as its postulate a genuine relation, honestly created and honestly maintained. If that condition is not satisfied, if the relation is merely a sham and a pretense, the juror may not invoke a relation dishonestly assumed as a cover and cloak for the concealment of the truth. In saying this we do not mean that a mere charge of wrongdoing will avail without more to put the privilege to flight. There must be a showing of a prima facie case sufficient to satisfy the judge that the light should be let in. Upon that showing being made, the debates and ballots in the jury room are admissible ”.
We realize the gravity of disclosure of the conduct of the jury, and in this instance it becomes necessary because of the serious unusual circumstances presented; if the court believes that the charges warrant a full hearing, to determine whether the defendant has been the victim of a prejudiced jury and that its verdict was influenced by prejudice and tainted by race bias, the action of the court becomes clear. The charges must not be speculative and alb surd, but there must be some substantial factual basis to justify an examination of the jury that rendered the verdict which is sought to be set aside.
It is important to preserve the ancient and prevailing belief that it is the privilege of jurors to return a verdict freely according to their honest opinion and conscience. The jury should have the assurance that they shall not be compelled to disclose *511 any conversations that took place within the secrecy and sanctity of their private quarters. This custom has long been accepted and assumed by citizens performing jury service. It has given strength and firmness to our jury system. Indeed, it is obviously of great importance to the continuance of this system that a jury shall be free from inquiry (unless corruption, or the commission of an offense, or some circumstances that destroy a fair determination, have been charged against the jury) and remain untrammeled after the verdict.
Our social policy dictates the continuance of this principle. On the other hand, when there is a substantial foundation for an inquiry to determine whether a grave injustice was perpetrated behind the veil of secrecy, does not public policy demand a relaxation of the nondisclosure formula and demand a full and open hearing in the interest of justice? Weighing the considerations and the resulting consequences, the court is of the firm conviction that the true administration of justice will not be affected nor will it in any way be impeded by directing that a hearing be held.
In People v. Durling (303 N. Y. 382, 384), a defendant was convicted of manslaughter in the first degree; before sentence the defendant moved under section 405 of the Code of Criminal Procedure for a new trial, among other grounds that the defendant’s rights had been prejudiced by reason of the misconduct of jurors; from a denial to permit a hearing, the court held: “ [T]he trial court’s flat refusal to hear such evidence * * *
amounted to an abuse of discretion (People v. Leonti, 262 N. Y. 256; People v. Gallo, 149 N. Y. 106 ; McHugh v. Jones, 283 N. Y. 534; Farrer v. State, 2 Ohio St. 54) ” and the trial court was directed to hold a hearing.
Notwithstanding there is great need that the conduct of a jury should be untrammeled, that it should be free of fear of embarrassing publicity, it is likewise compelling that the actions of the jurors shall be fair, impartial and free of any immoral impurities. Those who serve faithfully will not be fearful to speak their minds.
It is an axiomatic principle firmly embedded in the field of fundamental law that it is vital to the judicial system that a jury shall determine the case free from external causes which tend to disturb the full and untrammeled exercise of deliberate and unbiased judgment, and it is of equal importance that there be no appearance or suspicion of improper influence (23-A C. J. S., Criminal Law, § 1368, p. 972).
A verdict should be the result of deliberations that are calm, dispassionate and honest, by jurors who are impartial and free *512 from bias and prejudice. The stability of jury trials should not be destroyed. Before a verdict is overturned or impeached, it should only be done with great care and discernment. The accused’s rights must be protected. Each person, irrespective of his race, creed or color or nationality, must receive full and equal consideration. Every safeguard provided by the Bill of Rights and constitutional guarantee for the protection of persons accused of crime should be scrupulously recognized and rigidly preserved by our courts. It is important that no verdict be set aside unless it is upon substantial grounds, otherwise no verdict would ever be safe from attack. The claim must be upon a logical and reasonable basis and must clearly establish a likelihood that it deprived the accused of a fair trial; if the conduct of any of the jurors tends to indicate that there is a possibility that the verdict was influenced in some way by bias and prejudice, the trial must be declared a nullity. If the charges are sustained, it is convincing proof that the talesman never was eligible to become a member of the jury; that from the beginning he was disqualified on the ground of prejudice, and his vote for conviction was, therefore, a nullity (cf. Clark v. United States, 289 U. S. 1, supra). It is the duty of the court when convinced that “ the interests of justice ” would be best served, to set aside the verdict of a jury (People v. Groom, 174 Misc. 250, 251).
Section 465 of the Code of Criminal Procedure, insofar as it applies to this case, states the following: ‘ ‘ The court in which a trial has been had upon an issue of fact has power to grant a new trial, when a verdict has been rendered against the defendant, by which his substantial rights have been prejudiced, upon his application * * * 3. When the jury * * * after retiring to deliberate upon their verdict * * * have been guilty of any misconduct by which a fair and due consideration of the case has been prevented; 4. When the verdict has been decided * * * by any means other than a fair expression of opinion on the part of all the jurors; 5. When the court has misdirected the jury in a matter of law # * # 6. When the verdict is contrary to law or clearly against evidence ” 7. Upon newly discovered evidence.
The court has authority to grant a new trial when the motion under this section is addressed to the conscience and sound judicial discretion of the Trial Judge (People v. Spiegel, 149 Misc. 439; People v. Johnson, 110 N. Y. 134; People v. Kraus, 147 Misc. 906; People v. Groom, 174 Misc. 250, supra; People v. Leonti, 262 N. Y. 256, supra). “ The motion is addressed to the sound discretion of the court, and whether it should be *513 granted or refused involves the inquiry whether substantial justice has been done; the court having in view solely the attainment of that end. ’ ’ (People v. Jones, 115 N. Y. S. 800, affd. 194 N. Y. 83.)
The defense, in support of this motion, argues that the newspapers contained inflammatory articles in reporting the arrest and the alleged confessions made by the defendant in connection with other unrelated crimes; that the widespread publicity given by the newspapers, television coverage and radio was continuous and with such a degree of frequency that the jurors unquestionably could have been influenced by these reports; that in spite of the- numerous admonitions given by the trial court (on 18 different occasions), the jury violated the warnings that they were to permit no extraneous matters to be considered during the trial and their deliberations.
In Welch v. United States (135 F. 2d 465, 466-467), the court stated, in a motion to declare a mistrial: “ In this situation, it is necessary to reconcile our solicitude for the rights of the accused persons, o-n the one hand, with our insistence upon the freedom of the press, on the other. We are not willing in this country, to exercise such severe restraints upon newspaper publicity during trials as has been done in England. This has resulted, sometimes, in embarrassment but, nevertheless, so long as the press falls short of actual contempt, it is better to depend on the self-imposed restraints and disciplines of the professional group, than to stifle and censor a traditionally free press by governmental restraints. This being true, it results that our courts must operate, realistically, under conditions which sometimes imperil the purity of the verdict. It would be completely unrealistic to hold that disqualification' of a jury occurs whenever police officers overstep the bounds of proper conduct, by releasing information concerning accused persons, or when newspapers violate their own canons of professional conduct, by printing inflammatory articles during the course of a trial. As Mr. Justice Holmes has said: ‘ If the mere, opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under conditions of the present day.’ Unless the jurors were improperly influenced, or, at least, unless there is reason to believe that they were subjected to improper influence by such articles, there is no occasion for declaring a mistrial. ’ ’
It cannot be denied that the active participation by the police in the interviews before TV cameras and statements given to the press which not only concerned this defendant but gave impressions to the general public that the accused had confessed to *514 three unrelated murders, created an atmosphere of hostility; indictments charging this defendant with the commission of two murders in an adjoining county were dismissed, however, not until months after the defendant was convicted on the indictment which is the basis of this application. There is a great likelihood that these matters created a deep-rooted prejudice which might necessarily influence the average person.
In People v. Sepos (22 A D 2d 1007), the defendant after conviction moved to vacate the judgment and sought a new trial because of the inflammatory widespread publicity given to the case. The court condemned the actions of the law enforcement officers for the part they played in putting the defendant on display before TY cameras and newspaper reporters, and remitted the matter to the trial court for a hearing ‘ ‘ to determine whether the television coverage depicting the defendant in unfavorable circumstances jeopardized or in any way prejudiced his rights to a fair and impartial disposition of his ease.” The Court of Appeals cited with approval that the misconduct of a juror required the reversal of the judgment even though the juror stated that his conduct did not influence his verdict. Judge Fuld, in writing a dissenting opinion in People v. Cocco (305 N. Y. 282, 287) stated: “ [T]he statute empowers the court to gránt a new trial when the jury has been 1 guilty of any misconduct ’, only where the defendant’s 1 substantial rights- have been prejudiced, ’ and only where such misconduct has ‘ prevented ’ -a ‘ fair and due consideration of the ease’” (Code Crim. Pro., § 465, suibd. 3).
The reluctance to impeach the verdict of the jury, predicated upon the ¡statements made by them after the trial, should not deprive the accused person of the right to have a determination as to whether any conduct or improprieties during jury deliberations violated this basic guarantee of a fair, impartial trial, free of any prejudice and racial bias.
In People ex rel. Nunns v. County Ct. (188 App. Div. 424, 430) ,it was stated: “ The public policy of this principle of secrecy is in the furtherance and assurance of free, fearless and untrammeled deliverance upon the evidence, and for that reason the proceedings of the jurors preliminary to the verdict — the talk, discussions, informal votes and the like — are declared inviolable for all time.”
However, this principle presupposes that no extraneous considerations form the basis for the verdict, other than the evidence alone. Is there any justifiable reason to place an official seal on such serious misconduct that raises grave doubt as to the validity of the verdict? The answer to this question is quite *515 obvious. Human rights must be safeguarded. Deprivation of fundamental constitutional guarantees endangers the basic foundation of our democratic processes. Bias, in any of its ugly forms, has no place in a free society; race prejudice prevents equal consideration to all people. The trial must be conducted in the tradition of American justice. The finding of a verdict of guilty must be founded in accordance with our logical processes and uninfluenced by prejudicial conduct. A prospective juror, who conceals the fact that he has a racial prejudice against the accused on trial, cannot properly sit in judgment of the accused, and if the facts are established at a hearing a new trial would be required. (People v. Leonti, 262 N. Y. 256, supra.)
A juror, influenced by race prejudice, tiommits a grave injustice against a fellow human being. It deprives him of a sacred constitutional guarantee to a fair and impartial trial and thereby requires the court to declare the "proceedings a nullity. “ The county prosecutor and the court should be ever zealous to preserve the purity, fairness and impartiality of juries, and to use all means provided by the Legislature to prevent interference with the due administration of justice.” (People ex rel. Nunns v. County Ct., 188 App. Div. 424, 451-452.)
The court conducted a full and extensive hearing devoted principally to the conduct of the jury and also to the contention which concerned the suppression of evidence by the prosecutor. It consisted of over 200 pages of testimony, and in the f ollowing paragraphs is a part of the transcript of the hearing. (The Words and names deleted were ordered by the court.)
One of the jurors was questioned as follows:
Q And in the course of the deliberations, after the ease was presented to the jury, did an individual juror make a remark which, in substance, stated, “ This is nothing compared to what he will get in New York.”
the witness: Well, there was lots of discussions, your Honor. A statement was made. I don’t recall the exact wording of the statement, but a statement was made.
Q Well, in essence and in substance, what was the statement? A Well, “This is nothing compared to what he is going to get.” That is as far as I can recall it.
Q Can you identify the juror that made that statement,-? A Yes, sir.
Q Is he in the courtroom today? A Yes, sir.
Q Now, you said that one of the jurors made a remark, “ This is nothing like what he is going to get,” is that correct? A Yes, sir.
Q Now, when this observation was made, was it during the time that evidence was being submitted to the jury or was it after the jury had retired to deliberate? A This was while we were deliberating on a certain point. We were deliberating on one side of the room.
*516 Q But these remarks were not made during the trial itself, that is, while the evidence was being submitted and before the Judge’s charge, was"it? A No, not before the Judge charged us.
Q It was made while the jury was deliberating? A Yes, sir.
Q What had no bearing? A His remark. We were discussing a point of identification and it had no bearing on what we were discussing at that time.
The following is part of the transcript during the examination of a nonjuror witness:
Q At the termination of the trial in question here, the People against Whitmore, did you interview any of the jurors who sat on that trial ? A Several.
Q This is right after. How long after the conviction was this? A Moments.
Q Do you recall what questions you asked Mr. -:- and what answers he gave? A Well, not verbatim, but in general.
Q In substance, do you recall, sir? A Yes, I was primarily interested in knowing whether Mr. - and several of the other jurors weré aware of the pending indictment in the Wylie-Hoffert murders.
Q They were aware? Did you ask him whether it had been discussed during the course of the trial amongst the jurors? A Yes.
Q What was his answer? A Well, I don’t recall specifically, but they all indicated that it was.
the witness: He said that they were aware of the Wylie-Hoffert indictment and that Mr.-had kept" the discussion down about the indictment.
Q In response to your questions about the -awareness of the Wylie-Hoffert indictment, did Mr. -staite to you that some of the- jurors had spoken about it privately. A Yes.
Q But, it is your conclusion based on what they said to you? A Based on the fact that they were aware "of them, I conclude that they were influenced by them.
Q Does your conclusion that they were influenced by Wylie-Hoffert, is that based on an inference from what the jurors -said, or is it based solely on your own conclusion as an experienced reporter that, having known about the Wylie-Hoffert case, they must have been influenced by it? A Well, it is a combination, I think.
the court: At that time some of them w.ere jurors, they had identified, themselves to you as being jurors, is that correct?
the witness: Yes, your Honor.
the court: And you directly heard from some of the jurors that they had heard about the Wylie ease, the Wylie-Hoffert case in New York, is that correct?
the witness: That’s right, sir.
The following is part of the transcript of the testimony of another juror:
Q Mr.-, you are a juror in this ease in question? A Yes, sir.
Q Mr.-, as a result of your service and some time after that service,' did I come out to speak to you? A Yes, sir, about two months later, I think.
Q As a result of that conversation did you give me an affidavit? A Yes, sir.
"Q Did you discuss with anyone the facts which subsequently appeared in this affidavit? A Yes, sir.
Q And you called him for the purpose of communicating with me, is that so? A Yes, sir.
Q And the purpose of that was to give me the facts which subsequently appeared in the affidavit, is that correct? A Yes, sir.
Q Now, Mr. -, would you kindly repeat for this Court, Mr. Koota, what the facts were that you put in the affidavit? A I believe that practically *517 everyone in the jury knew about the Wylie-Hoffert case before we reached the final verdict on it. Only one person, during the discussion, disclaimed a note of knowing about it.
Q In other words, it was discussed? A I don’t know whether it was discussed privately or not, but everybody knew about it. There were other remarks made. I think someone else said, “What would happen to him if he was convicted first here or somewhere else — ”. That was also a remark.
Q Well, what did you say? A I made a remark that someone had made — I have the three words exactly. Can I take it out?
the witness: Excuse me, I have it written down here. Somebody made a remark about, “ These guys are all the same, they have got to have it.” But it is only one person. It was strictly overplayed. I believe everyone knew about the Wylie-Hoffert situation in the ease. It was in the newspapers. Nobody could escape knowing it. It was on TV and everything else about the case. I didn’t know about the case until after I was about a day into it. I didn’t know about it at all, and it suddenly came out in the newspapers and I heard about it on TV one night before I went to work. It came out about the case.
the coubt: Was there a statement made by anyone in the jury while the deliberations were going on or during the trial to the effect of what would happen to Whitmore in this trial if he were convicted? “It would be nothing compared to what would happen in another matter” ?
the court: And I would like to know whether this is a fact or whether this is a conclusion on your part. You said something about you heard someone say, one of the jurors, “ That these fellows like their sex.” the witness: Someone had made — one person had made the remark,
but it was strictly overplayed.
the coubt: And, in addition, you said, "They must get it some place. They-like Jack rabbits.” Was that said?
the witness: I will give you the exact wording of it. I didn’t have the exact wording at the time, but I have the exact wording of what was said, if you want it.
the witness : Here is the exact wording, “ These guys are all the same, they have got to have it. They-like Jack rabbits.”
the coubt: Let me ask you this, Mr.-: I want you to be perfectly frank and try to answer me. “ Contained in this affidavit is a statement in the context and manner in which he so stated and from other things this juror said I got a very definite impression that he was referring to the fact that the defendant was a Negro.” Now, you signed that. How did you come to that conclusion ?
the witness : Well, the way he was speaking on the situation. He had repeated it once before in a different discussion and in something else at this point. And I felt he mentioned it in that and I said, “quiet” at this point where he made the mention of it. I yelled it out. I don’t know if anybody else caught it. But I was extremely angry the second time I heard it.
the court: Was that during the time of the trial, the taking of testimony or during the deliberation?
the witness : The first time occurred during the lunch time and the second time occurred during the deliberation, about the end of the deliberation, about the sixth or seventh hour.
Q In other words, it occurred more than once, is that correct? A Yes, it occurred twice.
Q You also stated in this affidavit, or to me, sir, didn’t you, that a juror stated in the course of deliberations that “this was nothing compared to what he was going to get in New York,” is that so? A Yes, sir.
*518 Q You also stated that you heard another juror state, in the course of deliberations, “ Finding him guilty here would be doing him a favor,” is that correct, sir? A Yes.
Q Is that the only thing about all of your comments on that envelope ? A Well, that was the major thing, about the statement on the second part. The first part was there with the statements that I made that practically all the jurors had known about the case. One person disclaimed knowledge of it during the deliberations. And I don’t think anybody else disclaimed any knowledge of it.
Q And you got the impression from the remark about “sex” that one juror made to another that he was prejudiced against the Negroes, is that correct ? A He may have been prejudiced against them or may-
Q Did you report this to the Judge? A No, sir.
Q I would like your frank answer. Was it the fact that you were disturbed ■and uneasy about whether this defendant had received a fair trial which prompted you to make these notes? A I was aggravated about the situation and what had occurred because of the people knowing about the other situation and what had occurred in the discussion and about the other remark that was passed.
Q Now, these references to the Wylie-Hoffert case and this business of the “ jackrabbit ” were these sporadic discussions or were they of volume, and substance ? A They occurred, I believe, during the trial. I think they occurred during the trial.
The following is part of the transcript of the examination of a nonjuror witness:
Q Would you read, Mr. -, the notes that you made a few minutes after you spoke to Mr.-as to what Mr.-- — ■ told you that night? A Well, I have here * * * He said that from the beginning of the trial ■two jurors felt that Whitmore was guilty of the murder of .the two girls in Manhattan, and that they said that “it doesn’t make any difference because if they didn’t get Mm here they will get him in New York.” He said that another juror expressed prejudice against Negroes and Puerto Ricans. I might say here, that he told me first that a juror had expressed prejudice against Puerto Ricans, and when I reminded him that Mr. Whitmore was a Negro, and he said, “Well, Negroes and Puerto Ricans.” And that this juror thought Whitmore was guilty of attempted rape because “ They got to have their intercourse 'all the time. 'They -— - — ■ like jackralbbits.”
He said that the jurors discussed newspaper stories that linked Whitmore to a murder in Brooklyn and the murder of two career girls — of the two career girls. This despite —and this is my own observation here. This despite reported admonitions by the Judge not to read about the Case and not to discuss it until the case was given to them for deliberation.
He said that but for the prejudicial remarks of some jurors — because of prejudicial remarks which swayed some of the jurors there were — there might at least have been a hung jury * * * hut I do remember asking him who that juror was who was threatened, and he said he would rather not tell me nor would he identify any of the other jurors who was supposed to have made the prejudicial remarks.
The following in pant is the transcript of the examination of another juror:
Q Did you say, Mr. -, that the Wylie-Hoffert case came out in the papers a couple of days later? A A day or two later.
*519 Q While you were in the course of hearing testimony? A Yes.
Q And you saw Wylie-Hoffert? A Yes.
Q Did it mention George Whitmore? A Yes, it did.
Q But you did not read about it and you found out about it after you were chosen? A Yes. But I didn’t go into detail about it. That had nothing to do witih this case as far as I was concerned.
Q Mr.-, what did you read? A That he had confessed.
Q To what? A To the Wylie-Hoffert case.
Q Had you ever heard of the Wylie-Hoffert case before? A Before the trial?
Q Yes. A Yes.
Q What had you heard about it? A That these two girls had been murdered.
Q Did you read anything else about it? A That they were looking for the suspect.
Q What was your reaction when you first read about the Wylie-Hoffert murder? A Well, I thought it was a terrible thing.
Q Then in the course of the trial, sir, you read a newspaper that mentioned the Wylie-Hoffert case, is that correct? A Yes.
Q And in that article you read that this defendant, George Whitmore, had confessed to the Wylie-Hoffert murders, isn’t that so? A There was something about it, yes.
the court: How, Mr.-, during your deliberations did you see any newspapers in the jury room?
the witness: Yes, we did.
the court: And did any of them relate to any headlines of this Hew York case where the defendant was related to it?
the witness: There was mention of it, but I didn’t go into it too deeply, your Honor.
the court: Did any of the jurors talk about it during the occasion of deliberating this case?
the witness : It was just brushed off very fast.
the court: But was there any talk about it on the part of any one juror during your deliberation?
the witness: Well, from what I recall, we had all seen certain parts of it in the paper from time to time, and it was mentioned. But as far as going into it, we were trying him on one Case.
the court: I understand that. How, I am asking you whether, during your 'deliberations, did any juror at any stage of your deliberating say anything about this fellow, that he was also mixed up in the Hew York case, in the Wylie killing?
the witness : I think it was said.
The following is a part of the transcript during the examination of another juror:
Q Mr.-, did I understand you to say that you did make the comment
about “this is nothing compared to what he will get in Hew York” ? A. On the way to his ear. He was kind enough to offer a ride with two other men. I said to him, “He is a lucky boy in my opinion.”
Q Why was he a lucky boy? A Just my opinion.
Q This was after he was found guilty? A That’s right; on the way to the car.
Q He was a lucky boy because he was found guilty? A That’s right.
Q He would have been unlucky if he was acquitted? A I don’t know. At that time there were two murder raps going after him.
Q Did you know, about the Wylie-Hoffert murders in Hew York, sir, at the time he was tried? A Yes, sir.
*520 Q Did you know about an Edmonds’ murder charge in Brooklyn. A Yes, sir.
Q And you read then- and knew then that he bad confessed to the WylieHoffert murders ? A That’s right.
Q Did you know then that he had confessed to the Edmonds’ murder? A Yes.
Q That was while you were on the jury you had .this knowledge, is that right? A I told them I had that knowledge.
The following is part of the questions asked during the examination of another juror:
Q Was there any discussion about the other crimes in which this defendant was charged ? A This collateral remark that was already testified to by several jurors.
Q Whait do you mean? What was that collateral remark, as best you recall? A “ That this is nothing compared to what he will be getting in New York.”
Q Was that before the jury had returned its verdict? A That was during the deliberations.
Sufficient canse has been shown to raise grave doubt whether the accused received a fair and impartial trial. In an atmosphere of hostility, constantly fanned by waves of unfavorable publicity, it placed a most trying burden, even on those well-meaning jurors, who could not withstand the tremendous pressures, born out of the extraneous matters that undoubtedly crept into the jury room. If it was questionable that the climate in which the accused was tried was not permeated by prejudicial influences, that would warrant the court to invalidate the verdict; surely, justification to vacate the verdict is confirmed by proof that serious extraneous matters were discussed by the jurors in addition to comments indicating racial bias. Prejudice or racial bias, in any of its ugly forms, has no place in an American court of justice. It destroys the concept of fundamental fairness; it steals from the accused full and equal protection of the law, and strips him of those safeguards guaranteed and secured by the Bill of Rights and the provisions of the Constitutions both Federal and State. Failure to act in a case that raises grave doubt of suspected conduct that made a fair and impartial trial an impossibility would violate every principle of fairness and decency. The obligation of the court is clear. Any concern expressed in disturbing the verdict of a jury must he subordinated to the rights of the accused when the court is convinced that he has been deprived of one of the constitutional guaranteed “ absolutes ”. Deprivation of the absolute right of accused to a fair and impartial trial reduces the process of law to a mere sham (Mooney v. Holohan, 294 U. S. 103). It destroys the hope of fundamental fairness and undermines the constitutional provisions of the Fourteenth Amendment clause of the Federal Constitution.
*521 In Mesarosh v. United States (352 U. S. 1), the decision passed only on the integrity of the criminal trial. It was stated that it was the duty of the court to cleanse the atmosphere of all impurity. Nothing should be permitted at a trial that is even suspect of unfairness or injustice. As was succinctly said by Mr. Chief Justice Warren in Mesarosh v. United States (supra, p. 14) in referring to the court’s obligation:
“ If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity.
‘ ‘ ‘ The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. This court is charged with supervisory functions in relation to proceedings in the federal courts. See McNabb v. United States, 318 U. S. 332. Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted.’ (Communist Party v. Subversive Activities Control Board, 351 U. S. 115,124.) ”
It is the only obligation imposed on the court to guard and enforce every right secured by the Constitution (Robb v. Connolly, 111 U. S. 624, 637). This case presented many problems; for instance, did the publicity concerning the defendant in connecting him as the confessor of the unrelated crimes, seep into the jury room and so affect and influence their deliberations that it created grave doubt that the verdict was not tainted by these extraneous matters. The jury has the task of searching for the truth, and in a case such as the one at bar, their function was not an easy one in light of the subsequent events. In People v. Robinson (273 N. Y. 438), a motion for a mistrial was made upon the ground that the rights of the defendant were irretrievably prejudiced and that during the trial extraneous matters were heard. The court admonished the jury to disregard it. The same resulting dangers confront a defendant if the extraneous matter pollutes the course of a fair trial during the presentation of evidence or during the deliberations of the jury. In any event, it destroys the essence of fundamental fairness. The Robinson case was reversed. The trial court refused to grant a mistrial. Judge Lehman, writing for the court, stated (pp. 444, 445): “ An accused is entitled to a fair trial. Our rules of law are intended to guarantee to him that right and to afford him protection against its invasion. * * * Can it be said reasonably that the admonition of the court removed the influ *522 ence which otherwise the statement of the witness would naturally have had? ”
At pages 445 to 446 of the Robinson case, the court further stated: ‘ ‘ Admonition to disregard evidence which is stricken out is easy to give and hard to follow. Judges trained by years of experience to base decision solely upon competent evidence contained in the record are not always completely confident of their ability to disregard and remain uninfluenced by information, or even impressions, conveyed to them dehors the record. The trial judge could not by admonition cause the jurors to forget what they had been told nor could he eradicate the impression that the defendant by objections was successfully excluding proof that the defendant habitually committed larceny. It is impossible to say that it did not influence the verdict. ’ ’
So it would seem that it was impossible in the Whitmore case to separate these extraneous matters and prejudicial comments from the minds of the jury that would assure the defendant a verdict uninfluenced by any outside matters.
The conclusion is inescapable; the accused was deprived of the kind 'of a trial guaranteed by constitutional mandate. The United States Supreme Court has consistently pronounced that the failure to secure to" the accused ‘ ‘ fundamental fairness ’ ’ is a denial of due process of law. The Fourteenth Amendment clause to the Federal Constitution provides, in part, that no State shall “ deprive any person of life, liberty, or property, without due process of law”. This due process clause is also contained in the New York State Constitution (art. I, § 6).
The court is cognizant that there are many who differ on the subject of impeaching a jury verdict. Strengthened by the power of the ‘1 conscience of the court ’ ’ and encouraged by many of the well-defined authorities cited herein, the court could do no less than grant a new trial to the defendant. This decision does not in the slightest degree reflect on the great majority of well-meaning .and conscientious citizens who have served as jurors. Those who accept their civic responsibilities with grave concern will not be deterred from performing their duty according to their own conscience without fear and free of partiality and prejudice. Was there any such conduct, or extraneous matters discussed in the jury which prevented the fair and due consideration of the evidence ? If there was such a possibility, even though it was unintentional, that any unfair comment was made which influenced the verdict, then, this verdict must be set aside and the defendant must be accorded a new opportunity to answer the charges in an atmosphere that will guarantee and. provide a forum where the accused will receive a fair and *523 impartial trial before a jury, free of any bias or prejudice. The jury finding must be based on the evidence and the law and in accordance with their obligation and oath. The interests of justice may require, when warranted by the facts as in the case at bar, that the veil of secrecy be lifted and that the truth be brought into the open, and disclose the facts that form the basis of this inquiry. It is important that the public shall maintain their confidence with the knowledge that the power of constituted authority shall rigidly protect the rights of all those who have been aggrieved and that no one shall be denied due process of law.
One of the contentions raised by the defense was that evidence was suppressed by the prosecution. It would be grossly unfair not to state at this time that the court had full confidence in the good faith of the prosecution. A part of the minutes of the hearing that are briefly quoted in the following transcript clearly indicates that the prosecutor’s opinion that the evidence (F. B. I. Report) was inadmissible was a reasonable opinion. However, this situation emphasizes the necessity of disclosure by the prosecution of evidence that may reasonably be considered admissible and usable to the defense. When there is substantial room for doubt the prosecution is not to decide for the court what is admissible or what for the defense may be useful (Griffin v. United States, 183 F. 2d 990, 993). Implications were made by the defense that in view of the F. B. I.’s report the prosecutor’s summation in reference to the button and coat was prejudicial and unwarranted and had no logical basis. In all fairness, the claim that the prosecutor’s contention in his address to the jury was predicated on the inference that may reasonably be deduced from the evidence in this case was not entirely without merit.
Suppression of evidence in the possession of the prosecution which is unknown to the defense may involve a matter of due process. It may well be that the strategy or the theory of the prosecution in a given ease is not to offer certain evidence. However, this does not relieve him from the obligation that he shall reveal and make known to the defense any evidence or information that may or may not be usaible to the defense; indeed, the criteria is not a question of admissibility or relevancy. The legal questions are for the court to determine and should not be left to the prosecutor’s opinion.
In People v. Carborano (301 N. Y. 39), the defendant in that case was convicted of two crimes of grand larceny in the first degree, and the record contains sufficient evidence to have warranted a verdict of guilt. It was claimed that the prosecutor *524 created the false impression that the defendant at the time of the arrest was in possession of stolen property in addition to the charge against him and other serious offenses. (Italics mine.)
The Whitmore case presents similar circumstances. Whitmore was being tried for one crime while he was being branded as a confessed murderer in three other unrelated crimes. Judge Fold’s opinion is clearly applicable to the facts in the present ease where he states, in part, as follows (People v. Carborano, supra, pp. 42-43):
‘ ‘ [W]hile we may not be able to say with certainty, that absent the errors remarked, the verdict would have been one of acquittal, we may say with some assurance that the repeated improprieties had a decided tendency to blur the issue for decision and to prejudice the jury. (See People v. Tassiello, 300 N. Y. 425; People v. Mleczko, 298 N. Y. 153,162 * * *; People v. Posner, 273 N. Y. 184, 190; People v. Sobieskoda, 235 N. Y. 411, 420; People v. Marendi, 213 N. Y. 600, 619-620.) In a very real sense, therefore the defendant was deprived of his right to a fair trial, a trial neither colored nor influenced by irrelevant matters likely to mislead or confuse the jury. (See People v. Tassiello, 300 N. Y. 425, supra.)
“ Nor can a court’s instructions to jurors to dismiss from mind matters improperly brought to their attention always assure elimination of the harm already occasioned. (People v. Robinson, 273 N. Y. 438, 445-446, supra.) If it did, then the prosecution would be in a position to violate the rules of fair conduct with impunity, secure in the thought that the verdict, if one of guilt, would not be upset as long as the judge simply directed the jury to'disregard what had occurred. * * * In the present case, while the court may have corrected some of the improprieties, neither its instructions nor its admonitions could possibly have cured the prejudice resulting from their commission. ’ ’
Can it be said that in the light of the determinations pronounced by the Court of Appeals and the compelling mandate of constitutional provision that this defendant was not so prejudiced as to amount to a denial of due process of law.
The defense called the Assistant District Attorney who tried the case. The folio,wing is an extract of a portion of the testimony that was adduced during the examination ,of the prosecutor:
Q Mr. Liehtman, were you the prosecutor in the ease of the People against Whitmore in connection with the complaint of Elba Borrero? A I was.
Q In connection with that investigation, did you, Mr. Liehtman, either in person or have ordered submitted to the Federal Bureau of Investigation *525 Laboratory in Washington, D. C., a button and a. coat which were exhibits or to be exhibits in that trial? A I personally took a button and a coat to Washington with Detective Aidala to the F. B. I. Laboratories for analysis.
Q Did you receive a report from the Federal Bureau of Investigation Laboratory in connection with their analysis of the button and the coat? A I received an oral report while I was there, and I received a written report some time subsequent.
(Report was received and marked as People’s Exhibit 1.)
Q Mr. Liehtman, did you receive this report from the Federal Bureau of Investigation in writing prior to the trial of George Whitmore? A I did.
Q Did you submit this report in evidence during the trial? A I did not.
Q Why, Mr. Liehtman? A The report itself — my understanding of the rules of evidence, for one, indicates that .a report is not evidence. Secondly, the report, and if I may have it, please, '* * * contains the expert conclu-
sion that “ It was not possible to determine whether or not the Q-l button had been attached to the K-l coat.” In view of that conclusion, it was my judgment that this report was probative of nothing.
Q Although the report itself may not have been the best evidence, you could have brought from Washington, from the laboratory, whoever made the analysis, couldn’t you, to testify as to their findings? A The expert would have testified to the conclusion in the report, as I stated it, and his testimony as such would have been probative of nothing.
Q Would he have also testified under examination as to the details that led him to the conclusion ? A Well, I can’t speculate as to what his testimony would have been as to the details. But the analyst, the chemist who analyzed it explained to me the reason that he could not make any conclusion based upon the details.
He indicated that the threads were different because, or might have been different because the button might have been sewn, torn off and resewn on that coat, so that the threads which came off on the button when Mrs. Borrero allegedly pulled it from the coat, might have either been the new threads that had been resewn to the coat, the old threads, the old original threads remaining on the coat or vice versa.
Q Doesn’t, in the body of the report, the analyst state the Q-l button, meaning the button you submitted, and the buttons remaining on the coat are different in size, design and construction, is that correct? A Well, the paper, of course, speaks for itself and that is correct. And the analyst explained that and the reason for the difference in the size are obvious. The button in question came from underneath the lapel on the coat, according to the testimony, on the coat which was a small type button that is hooked on with a string. This was a trench coat, and I think everyone is familiar with the type of button and the typé of string, and that naturally would have been different in size than the larger buttons that are used to keep the coat closed.
In any even, as the analyst indicated, this was an old coat and buttons had been off and on that coat in all probability a number of times. So that all the buttons on the coat, one was different than the other by necessity or, at least, if not by necessity, at least that is the reason he couldn’t make any determination.
Q Did he also state, the analyst, in the body of the report that the sewing thread attached to the. Q-l button is different from the sewing thread remaining on the coat in color, diameter and degree of twist? A That’s what the report indicates. As I said, as I explained earlier, he explained that difference as I indicated. He said that is why he could not- make a determination one way or another as to whether or not that button came from the coat.
*526 Q You say, therefore, that in your judgment you felt it was not worth while to introduce either the report or the analyst himself into evidence? A I said I felt that in view of the conclusion of the expert, which is the evidentiary opinion, the conclusion indicates that the expert could not say one way or another whether the button did or did not come from the coat.
Q Don’t you think that that report or the analyst, this evidence, contained in the report should have been submitted to a jury so that they could determine? A I do not.
The following questions and answers are from a statement made by the defendant during the trial:
Q What were you wearing? A I was wearing black pants and that coat. (Indicating tan poplin coat.)
Q Did you have this coat on when you were apprehended by the police today? A Yes.
Q I notice .there is a button missing from that coat; do you know when that button Was lost? A She could have grabbed it and pulled it off.
Q I show you a button, indicating a brown leather button. Is that the bind of button you bad on there? A Yes.
.Q And did you have that button on your coat before you grabbed hold of this wom'an? A Yes.
Continuing on questions directed to the prosecutor:
Q Now, Mr. lichtman, when you argued to the jury that this coat, this button came from the coat, on what evidence in the case did you base your argument? A I based my argument, firstly, on the testimony of Mrs. Borrero that when the defendant — when the defendant pulled away from her, she wound up with a button in her hand, which she identified as the button which is in question.
I based it further on the statement made by the defendant, which was in evidence, which you just read, and in which- he indicated that that was a button that was on the coat and which coat he said was the coat that was in evidence at the time.
Q S'o you are basing your argumente to the jury on the defendant’s own statement that that button had come from the coat? A Plus the other evidence in the case, specifically, Mrs. Borrero’s testimony with respect thereto.
Q Mr. Lichtman, you stated that you received no expert opinion to hook the button up with -the coat or not to book the button up with the coat, is that correct? A I stated-.
Q Pursuant to Mr. Koota’s questions. A I stated that the only expert opinion I had Came from two sources; the New York City Police Department Laboratory and the Federal Bureau of Investigation Laboratory, both of which indicated that they could not make-any expert conclusion as to whether or not the button did or did not come f rom the coat.
Q But you did receive an expert opinion, didn’t you, sir, as to whether the threads matched ? A Yes, I received expert opinions that said that the threads on the button did not match the threads on the coat.
Evidence in" the possession of the prosecution which is unknown to the defense must be revealed to the accused. The prosecutor ha's a duty to reveal or disclose • the existence of such evidence (Griffin v. United States, 183 F. 2d 990, supra).
In Napue v. Illnois (360 U. S. 264, 269), in a constitutional question involving denial of due process of law, Mr. Chief *527 Justice Warren, in delivering the opinion of the court, cited with approval People v. Savvides (1 N Y 2d 554, 556, 557, 558): “ The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach * * * That the district attorney’s silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair * * *. ‘Convincing though proof of guilt may be, and there can be no denial of its strength in this case, we could affirm ‘ only if we were to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant’s guilt.’” (People v. Mleczko, 298 N. Y. 153, 163.)
In Barbee v. Warden, Maryland Penitentiary (331 F. 2d 842), the petitioner contended that among other matter's, certain reports of ballistics and fingerprint tests made by the Police Department were not disclosed to the defense and he was therefore denied due process at his trial. Writing for the majority, Chief Judge Sobblobb stated that nondisclosure of these documents was fundamentally unfair notwithstanding the fact that it is not shown that the State’s attorney was himself guilty of an intentional suppression. Indeed, there is nothing to indicate that this official had been told by the police of the existence of these reports. With respect to the necessity for a showing of prejudice, the cases Sometimes draw a distinction between the knowing use of false testimony and the passive nondisclosure of exculpatory evidence. In the first type of case the sentence will be set aside without inquiring into whether the defendant has been prejudiced, while in the latter some consideration of the possible effect of the irregularity upon the fairness of the trial is necessary. How strong a showing is required in a given case will depend on the nature of the charge, the testimony of the state, and the role the undisclosed testimony would likely have played. (Barbee v. Warden, 331 F. 2d 842, 847.) In the present case, where evidence was withheld by the police which had a direct bearing upon and could reasonably have weakened or overcome testimony adverse to the defendant, we will not indulge in the speculation that the nondisclosed evidence might not have influenced the factfinder. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.
In the present cáse the undisclosed evidence was the F." B. I. report which was prepared by a technician connected with the F. B. I. The reason that fair play and justice require that subjects of this character should be disclosed to the defense *528 is because “ [t]he state has unlimited access to modern scientific aids and it is making more and more use of these devices. The defendant, on the other hand, is often indigent and generally cannot afford to make independent tests of his own. Grave injustice may be done if scientific studies which tend to show innocence are never made known to defense counsel and are never introduced at trial. Because of the great probative value of such .tests or reports ” they should be freely discoverable. (Comments, 42 Neb. L. Rev. 127, 131-132 [1963].)
It is therefore important that irrespective of the positive probative force of the undisclosed F. B. I. report and notwithstanding what effect it might have (if admissible) in favoring the defense, the prosecution should make information of this kind available to the accused for whatever purpose it may be used.
“ The Court of Appeals of Maryland [in Brady v. Maryland, 226 Md. 422] held that the failure to turn the particular confession over to his attorneys was ‘ a violation of due process, ’ despite the fact that the prosecution apparently acted in an honest, although mistaken belief that the unsigned confession would not have been admissible at the trial for any purpose.” (United States ex rel. Meers v. Wilkins, 326 F. 2d 135, 137.)
It has been conclusively determined by many authorities arising in both Federal and State court cases which have recognized the duty to disclose material exculpatory evidence as an ingredient of due process. (United States ex rel. Meers v. Wilkins, supra.)
In the case at -bar the. court finds no deliberate and willful suppression of any material evidence, explanation having been made by the prosecutor that he did not consider the undisclosed evidence to be admissible. It was not unreasonable for the Assistant District Attorney to believe that the evidence might be inadmissible. However, the court believes that it would have been in the exercise of better judgment for the prosecution to submit the question of admissibility to the court. Failure to do so did not relieve the prosecution of its obligation to reveal the F. B. I. report to the defense for whatever usable purpose it might deem proper.
In the Matter of Kapatos (208 F. Supp. 883, 888 [U. S. Dist. C.t., S. D. N. Y., 1962]), the court stated the following: “ The purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty' one. The average accused usually does not have the manpower or resources available to the state' in its investigation of the crime * * * In *529 view of this disparity between the investigating powers of the state and the defendant, I do not think it imposes too onerous a burden on the state to require it to disclose the existence of a witness * * #. At the very least the trial judge should have been made aware of this evidence, and a ruling should have been requested by the prosecutor with respect to his duty in the premises. His unilateral decision to keep the evidence undisclosed invited the risk of error.”
The nondisclosure of this evidence to the defendant was a violation of an obligation on the part of the prosecutor and the failure to reveal information that may be usable by an accused may be a denial of that fairness that is required under the due process clause of the Constitution.
During oral argument defense counsel referred to the method followed in the determination of the voluntariness of the defendant’s imputed confession. The date of the Whitmore trial was during November, 1964, subsequent to the decision by the United State Supreme Court in Jackson v. Denno (378 U. S. 368). The defendant’s conviction was immediately prior to the decision of the Court of Appeals in People v. Huntley (15 N Y 2d 72). Chief Judge Desmond, writing for the majority, described the procedure to be adopted and followed in the State trials where the voluntariness of the confession was involved. A full and independent hearing was conducted in compliance with the directives pronounced in the above decisions. Express findings and conclusions of law were made before its submission to the jury.
The first part of this motion dealt with the question whether the facts warranted a public hearing. Before any proof had been adduced at the ordered hearing (portions of the transcripts are hereinabove set forth), the attorneys agreed that the testimony and proof should be limited to the points raised concerning the conduct of the jury, .the effect of the widespread publicity on the trial, and the matter of the alleged suppression of the evidence. The other grounds urged were to be submitted and considered by the court on the record of these proceedings as well as the evidence contained in the entire trial.
It is obvious thus far, that the court believes sufficient support has been presented to sustain the contention that the verdict was influenced by misconduct of the jury, and by the extremely unfavorable widespread reporting that related to this defendant through the media of newspapers, TY coverage and the radio. The court deems it unnecessary to rule on the *530 other questions tendered; the decision is based on the misconduct ¡of the jury and the attendant circumstances. The other grounds, therefore, become academic.
The trial record ¡demonstrated every effort was made to purify the already polluted atmosphere. The court’s admonitions and charge attempted to guide the proper course for the jury. Instructions were emphasized that it was their duty to keep all extraneous matters from their deliberations; they were informed that the jury should discuss only the evidence that related to the charge for which this defendant was on trial; to do otherwise would ¡be in violation of their oath and duty (see People v. Robinson, 273 N. Y. 438, supra).
The court concludes that the conviction cannot stand. The hearing revealed that prejudice and racial bias invaded the jury room. Bigotry, in any of its sinister forms, is reprehensible; it must be crushed, never to rise again; it has no place in an American court of justice; it steals that fundamental safeguard of decency and fair play that is the cornerstone of our democratic processes. That requirement, in safeguarding the liberty of the citizen against deprivation through the action of the State, embodies the fundamental conception of justice which lies at the base of our civil and political institutions. (Hebert v. Louisiana, 272 U. S. 312, 316, 317.)
The verdict was rendered against the defendant by which his substantial rights had been prejudiced; that the jury was guilty of such misconduct and prejudice by which a fair and due consideration of the case had ¡been prevented (Code Crim. Pro., § 465, subds. 3, 4).
The court further concludes that in addition to the above finding, the press, television coverage and the radio reporting contributed in no slight degree to the atmosphere of hostility that surrounded Whitmore’s trial. Much controversy existed among the judiciary, Bar Associations ¡and representatives of the press concerning the problem of fair dissemination of news relating to the arrest and trials of those accused of crime. It is inescapable that the press media must share some blame for the unfavorable, widespread publicity concerning the defendant which made it extremely difficult, if not impossible, that this verdict was uninfluenced by the incessant inflammatory reports that branded the defendant as the confessor of three unrelated murders (People v. Sepos, 22 A D 2d 1007, supra).
The defendant was deprived of due process of law. The provisions of section 465 of the Code of Criminal Procedure give inherent power to the court to exercise its sound discretion to grant the relief sought herein. However, any State rule of evi *531 dence which would prevent disclosure of jury deliberations in a proper case must ibe subordinated to the United States Constitution. Section 1 of the Fourteenth Amendment of the United States Constitution contains the following clause: “No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”
Grave doubt persists whether the verdict was tainted by prejudice and bias. If so, the jury finding is suspect, and the defendant did not have a fair and impartial trial. He became the victim of injustice. When a person is deprived of that “ fundamental fairness ”, that decency and justice require, not alone does the accused suffer great harm, but all the people also suffer. “ [O]ur system of the administration of justice suffers when any accused is treated unfairly.” (Brady v. Maryland, 373 U. S. 83, 87.)
The court has given this proceeding considerable deliberation, and concludes, in the interests of justice, that there is only one course open to pursue. Accordingly, the verdict of the jury is vacated and set aside and it is ordered that the defendant be granted a new trial.
Submit order in conformance with the above memorandum decision.