28 N.Y.2d 826 (1971)
The People of the State of New York, Respondent,
v.
George Whitmore, Jr., Appellant.
Court of Appeals of the State of New York.
Argued January 12, 1971.
Reargued April 13, 1971.
Decided April 21, 1971.
Myron Beldock and Arthur H. Miller for appellant.
Eugene Gold, District Attorney (Aaron Nussbaum of counsel), for respondent.
Concur: Judges BURKE, SCILEPPI, BERGAN, and GIBSON. Judge BREITEL dissents and votes to reverse and dismiss the indictment in the following opinion in which Chief Judge FULD and Judge JASEN concur.
Judgment affirmed.
BREITEL, J. (dissenting).
Defendant may be innocent of this crime as he was of the other crimes to which he falsely confessed in detail. The issue, therefore, is not one of technical or procedural matters affecting one justly punishable, but not justly punished because of real or fancied procedural unfairness (see Friendly, Is Innocence Relevant? Collateral Attack on Criminal Judgments, 38 Chi. L. Rev. 142). The conviction then is one that cuts to the bone and, unless resolved beyond a reasonable doubt, is intolerable in a civilized criminal justice system.
On April 23, 1964, at about 1:00 o'clock in the morning on a dark and lonely street, a young woman, aged 20, the mother of a six-weeks-old baby, returning from her hospital work, had her purse snatched, and was subjected to an assault preliminary to a rape. A young policeman, two years on the force, had, from a distance, observed the couple walking, and, suspecting that the woman was being forced by her larger companion, followed. He came upon the pair in an alleyway *828 and shined his flashlight. The assailant said, "Oh my God!" and fled, the policeman in pursuit. The assailant escaped.
The woman had had a full-face view of her assailant. The policeman had seen only his profile. All police alarms and notations in police memorandum books, made shortly after the crime, describe the culprit, substantially, as "male Negro, 5'8" or 5'9", 20 to 25, 165 lbs., 3/4 tan coat", and, in some instances, adding "no further description." The victim, Mrs. Borrero, and the policeman, Patrolman Isola, on the third and on prior trials testified to recollections that differed from the recorded descriptions. The woman testified that her assailant was a light-skinned Negro, heavily pockmarked, no more than 5'7", about 135 lbs., and wearing a 3/4 tan coat. He wore a hat. In court, the policeman agreed with her description (except for the face which he had not seen) contrary to the details he entered, sometime after the crime, in the official police form (U.F. 61). He added that the woman gave him that description, including the information as to the culprit's pockmarked face. But, still he said, the man he saw in his flashlight and whom he pursued wore no hat.
Several hours after the crime, while the police officer was patrolling the same beat, he saw the defendant in an automatic laundry shop and questioned him. Defendant gave his name as George Whitman and an employment which proved false. Defendant was 19 years old, a light-skinned Negro, wearing a 3/4 tan coat, 5'6", 130 lbs., and heavily pockmarked. He was wearing a hat. Nevertheless, the policeman did not take the defendant into custody; instead, the two investigated a building into which defendant said he had seen a fugitive flee earlier in the morning, a policeman in pursuit firing shots. In short, the policeman did not recognize the defendant as Mrs. Borrero's assailant, either from his own recollection or from what he now says was the description given to him by the victim. Of course, defendant did not fit the police alarm or police memorandum book descriptions.
The bedevilling issue is the identification of defendant as Mrs. Borrero's assailant. At this point it is or should be evident that her courtroom identification of defendant comes after a history, partly documented, and for the rest undisputed, which demonstrates conclusively that the contemporaneously described assailant and the identified defendant did not match. That conclusive *829 demonstration appears from the record of the posttrial identification hearing, a part of the instant appeal.
Some 10 days before, in Kings County, in the same vicinity, a Minnie Edmonds had been killed and raped in a particularly sadistic crime. Still earlier, in New York County, there had been the bestial rape slaying of the Wylie and Hoffert girls (see People v. Robles, 27 N Y 2d 155). Following the Borrero attempted rape-robbery, the detective at the precinct concerned with the Edmonds case, a likely parallel, was alerted. On the early morning of the day following, April 24, the detective and the patrolman, Isola, went back to the vicinity and arrested defendant, who was still hanging around.
At the precinct house, defendant was shown alone, without a lineup, to Mrs. Borrero. She identified him positively. She, as is already known, was later to repudiate the police alarm and memorandum book descriptions as incorrect and not attributable to her. Before the day was over, defendant confessed to all three crimes, the Borrero attack, the Edmonds killing, and the Wylie-Hoffert rape-murders.
For a long time defendant was the man who killed the Wylie-Hoffert girls, the Edmonds woman, and assaulted Mrs. Borrero. Serious crimes had been solved and steps were taken to claim the substantial reward outstanding for the perpetrator of the Wylie-Hoffert murders. Indeed, defendant was to stand trial for the Edmonds killing but a hung jury was the outcome, followed by dismissal of the charges. On the first trial for the Borrero crime, the verdict was to be set aside, among other things, because of jury misconduct in learning and discussing defendant's triple confessions, stemming from widespread publicity about the Wylie-Hoffert murders with implication of defendant (People v. Whitmore, 45 Misc 2d 506).
The fact of the matter was that the triple confessions of April 24 were utterly untrustworthy. The Wylie-Hoffert double murder confession was to be established conclusively false, containing telltale earlier police and newspaper misinformation about the circumstances of that crime. Moreover, the Wylie-Hoffert killer was eventually to be caught, his confessions and admissions to friends recorded, and later repeated to a police officer (People v. Robles, supra). Most important, his confessions, made under surreptitious surveillance, confirmed and explained the true facts of that killing, which, as noted earlier, differed *830 markedly from the "facts" in the Whitmore confession. The confession of defendant to the instant crime was not used on the third and last trial. Interestingly, his confession had been used on the second trial; the Appellate Division reversed, however, because the trial court had not permitted cross-examination as to the three confessions by defendant, in an obvious effort by defendant to show that if one confession was false and unreliable the others were, too (27 A D 2d 939).
After the third trial without the confession the case was much simpler. It all turned on the identification of defendant by the victim, clear and positive, including the telltale words attributed to the culprit  first, I'll kill you and then I will rape you"  just as it would be imagined that the perpetrator of the Wylie-Hoffert and Edmonds killings might have said. The Appellate Division held the appeal in abeyance while it remitted the case for a posttrial identification hearing to determine whether Mrs. Borrero's in-court identification had been hopelessly tainted by the April 24 showup, on the day of the triple confessions.
The evidentiary identification hearing was held before the Trial Justice who had presided at the third trial. After taking over 600 pages of testimony, the hearing court ruled that Mrs. Borrero's trial testimony on the crucial issue of identification was untainted by the showup in the police station or any other improper suggestion.
The Appellate Division in remitting the proceedings for a posttrial hearing was following the new practice in resolving issues of admissibility of evidence, so grave as to raise issues of due process under constitutional standards. It has been the way that dangerously suggestive and even instigated pretrial showups of defendants have been tested as to their effect on the in-court testimony of identification on which the conviction hangs or a conviction may hang (see People v. Alston, 27 N Y 2d 822, 823; People v. Hanley, 27 N Y 2d 648, 649; People v. Rahming, 26 N Y 2d 411, 416; People v. Burwell, 26 N Y 2d 331, 335-336; People v. Damon, 24 N Y 2d 256, 260-261; People v. Hill, 22 N Y 2d 686, 688; People v. Ballott, 20 N Y 2d 600, 605-606; cf. People v. Gonzales, 27 N Y 2d 53, 57; People v. Logan, 25 N Y 2d 184, 191-192; People v. Lynch, 23 N Y 2d 262, 273; People v. Rivera, 22 N Y 2d 453, 455; People v. Brown, 20 N Y 2d 238, 242-243). Moreover, the proof on the hearing *831 must be "clear and convincing", that is, the proof must establish by clear and convincing evidence that the pretrial impropriety did not influence the in-court identification (People v. Ballott, supra; accord: People v. Rahming, supra; People v. Burwell, supra; People v. Logan, supra).
It is at the identification hearing that the details of the multiple, documented, different descriptions of the culprit were developed and which clash with the actual description of defendant. Also developed, of course, were the details of the linking of the triple crimes and the strange triple confessions by defendant. Of course, Mrs. Borrero says she did not know of the confessions before she identified defendant. She learned of them later and then consulted a lawyer about the outstanding reward, evidently believing that she had been, unfortunately, the instrument in apprehending the bestial murderer of the Wylie-Hoffert girls.
Enough has been noted to establish that the case against Whitmore is a hopeless one. No matter how positive the identification of him by Mrs. Borrero, the contradictory descriptions in the police records, the false or untrustworthy triple confessions, and the misconduct and ineptitude which made them possible, damn any prosecution of defendant for this crime unless, as in the Wylie-Hoffert case, fresh evidence comes from an untainted source. The positiveness of the Borrero identification is no better than the positiveness of the untrustworthy confessions. The positiveness in each instance is undermined or belied by ineradicable and contradictory facts of record and history.
Nonetheless, so that the picture may be even sharper, further details are added. A detective's memorandum book suggests, if it does not so state, that Mrs. Borrero's sister-in-law, who concededly observed the crime from a nearby upstairs window, said that the culprit had no hat. Her description of the culprit, which also makes him a taller and heavier man than defendant, may be discounted because she viewed the man from an angle. But it does agree with the police alarms. Patrolman Isola filled out the official police form, the U.F. 61, and he there recorded: "MN 20-25, 5'9" 165 lbs. No hat." He also testified that Mrs. Borrero told him about the pockmarked face but he neglected to enter that in the official form. The U.F. 61, of course, is made out sometime later and does not have the "rush" sometimes associated with the entries in the memorandum book.
*832 To sum it all up, the case against defendant is undermined: by the conflicting descriptions (by themselves tolerable, but when coupled with other elements, intolerable); the astounding failure of Patrolman Isola to recognize defendant, a few hours later, as the culprit, either from his own observation, or the singularly descriptive "light-skinned, pockmarked, Negro, in 3/4 tan coat, with hat, 5'7", about 135 lbs.", if in fact he had ever received that description; by the hopeless conflict over whether the culprit wore or did not wear a hat; by the triple false or untrustworthy confessions with their odor of instigation; by defendant's pliability in lying to police, established by the triple confessions, making of no consequence the giving of a false name (if it was a false name  Whitman instead of Whitmore) and false employment on the morning of the crime, and by the fortunate circumstance that defendant kept hanging around the vicinity to be questioned on the one morning and to be arrested on the next. But perhaps the most revealing item of evidence in the case is the quoted, "first I'll kill you and then I will rape you" comment of the culprit. This would provide the link to the other rape-killings and the potential for a living identification witness of the perpetrator of those crimes.
This is not the level of proof to support a criminal conviction in Anglo-American jurisprudence. The law says so and has for a long time. Moreover, such a deficiency raises a question of law which may not be cured or concealed behind the shield of a jury verdict just because there was evidence to establish the People's case (People v. Ledwon, 153 N.Y. 10, 17-18; People v. Gluck, 188 N.Y. 167, 171-172; Cohen and Karger, Powers of the New York Court of Appeals, § 198).
In the Ledwon case (supra), a noncapital homicide case, it was said:
"In a criminal case the denial of such a request upon the ground that there is some evidence, or whenever there is any evidence, may present a question of law. In a civil case a question of law can be raised in this court only when the finding or verdict has no evidence to sustain it and the question has been raised by exception. But that, I think, is not true in a criminal case. A party cannot be convicted of murder, or any other grade of homicide, whenever there is merely some evidence or any evidence to sustain the charge; and the court upon the *833 trial of such cases may be called upon to decide, as matter of law, whether the evidence is of such a character or quality as to warrant a conviction. If this were not the rule, the jury would in all cases be the sole judge of the question, and there would be no remedy in this court against convictions clearly based upon insufficient evidence.
* * *
"When this legal presumption of innocence is rebutted, or when guilt is shown beyond a reasonable doubt, must of course, in some cases at least, be a question of law. The statute has established a standard of proof in criminal cases and the proof must conform to that standard before there can be a lawful conviction. Whenever it is clear that it falls below the prescribed standard the accused is entitled as matter of law to an acquittal. It is quite true that in many and perhaps in most cases, where there is a conflict as to the facts, or the proof is open to opposing inferences, the question whether on the whole it is of such a character as to satisfy the statute is for the jury, but it is obvious that there must, in practice, be some cases where the court will be bound to interpose and decide the question as one of law and, we think, this is such a case. So long as the burden is upon the People of not only removing the presumption of innocence, but of establishing the guilt of the accused beyond a reasonable doubt, a mere scintilla or even some proof is not sufficient to warrant the submission of the case to the jury. (People v. Owens, 148 N.Y. 648.)" (pp. 17-18).
In analyzing proof in any case it is evident that the evidence must be taken as a whole. It is not analysis but self-deceiving sophistry to fragmentize evidence, establish the qualification of each item, and then ignore the falsity or unreliability projected by the whole. The danger is particularly present in this case. There is no doubt that the trial identification of defendant by Mrs. Borrero is made in positive terms but the positiveness is no less than that of the triple confessions given by this defendant.[*] The in-court identification and Mrs. Borrero's testimony on the posttrial hearing cannot and do not erase the events of April 24, 1964, the day of the confessions and the suggestive showup of defendant. The showup initiated identification is *834 tolerable if the confessions were true and destructive entirely of the People's case if the confessions were contrived. For if the confessions were contrived what confidence may men have in the court identification initiated by the showup. Moreover, the showup and the reconciliation of conflicting descriptions must then have laid out a path leading inevitably to the "clear and positive" testimony upon the trial. There could be no turning back except for the strongest of souls, even to still the pangs of conscience or to avoid the risk of perjury. The case is very sad for Whitmore if he is indeed innocent of this crime; it is sadder still for the criminal law if his and other convictions may stand on such unreliable proof. The truth is that the dismissal of charges against Whitmore would only write the end of a story already shameful, but the conviction standing will never be lived down.
Accordingly, I dissent and vote to reverse the judgment of conviction and to dismiss the indictment on the ground that the proof is insufficient, as a matter of law, to establish guilt beyond a reasonable doubt.
Judgment affirmed.
NOTES
[*] The triple confessions achieved notoriety even in the Supreme Court, see Miranda v. Arizona (384 U. S. 436, n.p. 455).