UNITED STATES ex rel. George WHITMORE, Jr., Relator-Appellant,

v.

Bernard J. MALCOLM, New York City Commissioner of Correction, et al., Respondents-Appellees.

No. 286, Docket 72–1706.

United States Court of Appeals, Second Circuit.

Argued Oct. 27, 1972.

Decided Jan. 22, 1973.

Rehearing En Banc Granted March 1, 1973.

Order April 23, 1973.

Myron Beldock, New York City (Beldock, Levine & Hoffman, New York City, and Arthur H. Miller, Brooklyn, N. Y., of counsel), for relator-appellant.

Hillel Hoffman, Asst. Atty. Gen. of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of New York, and Samuel Hirshowitz, Asst. Atty. Gen., New York City, of counsel), for respondents-appellees.

Aaron Nussbaum, Asst. Dist. Atty., Brooklyn, N. Y., as amicus curiae for the People of State of New York.

Before MOORE, HAYS and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal from an order of the United States District Court for the

Eastern District of New York, Hon. Walter Bruchhausen, *Judge*, entered on May 31, 1972, which denied without a hearing appellant's petition for a writ of habeas corpus.[1] We affirm the order of the District Court.

I.

■ In November, 1964, George Whitmore, Jr., was tried by a jury in Kings County, New York, and convicted of the crimes of attempted rape in the first degree and assault in the second degree. The trial justice set aside this conviction because of jury misconduct and widespread unfavorable publicity. People v. Whitmore, 45 Misc.2d 506, 257 N.Y.S.2d 787 (Sup.Ct.1965). Whitmore was tried a second time on these same charges in May, 1966. He was again convicted. This conviction was set aside by the Appellate Division of the Supreme Court of the State of New York because the defense had been improperly limited in its cross-examination regarding Whitmore's confession. People v. Whitmore, 27 A. D.2d 939, 278 N.Y.S.2d 706 (1967). On May 15, 1967, Whitmore was again tried for these crimes. The jury found him guilty, and on June 8, 1967, he was sentenced to concurrent terms of five to ten years for attempted rape and two and one-half to five years for assault. This conviction was appealed. The Appellate Division remanded the matter to the trial court for a hearing to determine whether the identification of Whitmore by the victim of the assault had been tainted by an improper show-up identification at the police station.[2] People v.

Whitmore, 30 A.D.2d 877, 293 N.Y.S.2d 712 (1968).

This hearing, like the trial, was held before Justice Helfand, Supreme Court, Kings County. After an extensive hearing[3] the court concluded that the in-court identification of Whitmore by the complainant had been independent of the improper police station show-up and that this in-court identification could have been made without the objectionable procedure at the station.

While his appeal from this conviction was still pending in the Appellate Division, Whitmore moved in the trial court to dismiss the indictment or for a new trial based on newly discovered evidence. On December 30, 1969, the trial justice denied this application because he believed this "newly discovered evidence" had been available to Whitmore prior to his third trial and that it would not have affected the verdict of the jury in any case.[4]

The Appellate Division affirmed Whitmore's conviction and the orders of the court denying his motion to suppress the identification testimony and his application for a new trial. People v. Whitmore, 35 A.D.2d 607, 313 N.Y.S.2d 433 (1970). The New York Court of Appeals affirmed Whitmore's conviction in a four to three decision. 28 N.Y.2d 826, 322 N.Y.S.2d 65, 270 N.E.2d 893, (1971). The Supreme Court denied certiorari. 405 U.S. 956, 92 S.Ct. 1180, 31 L.Ed.2d 233 (1972).

Whitmore filed a petition for a writ of habeas corpus in the Eastern District of New York five years after his third

1. Minutes of Hearing conducted by Hon. Walter Bruchhausen, United States District Judge, Eastern District of New York, dated May 23, 1972.

2. *See discussion of this show-up infra.* New York law is clear that where the *pretrial* identification procedure is unnecessarily suggestive or conducive to erroneous identification, the state must show by clear and convincing evidence that the *in-court* identification was not the product of, and was not affected by, the improper pretrial show-up. People

v. Logan, 25 N.Y.2d 184, 191, 303 N.Y.S. 2d 353, 358, 250 N.E.2d 454 (1969); People v. Ballott, 20 N.Y.2d 600, 606–607, 286 N.Y.S.2d 1, 6, 233 N.E.2d 103 (1967); People v. Rahming, 26 N.Y.2d 411, 416, 311 N.Y.S.2d 292, 296, 259 N.E.2d 727 (1970).

3. The hearing held by Justice Helfand in 1969 is recorded in 659 pages of transcript.

4. Unreported Order of Justice Helfand, New York State Supreme Court, Kings County, dated December 30, 1969.

trial and conviction and eight years after the crime had been committed. His petition sought release on bail pending determination of his case and asserted violations of constitutionally guaranteed rights. The District Court heard argument of appellant's claims, refused to hold an evidentiary hearing, and dismissed the petition. A certificate of probable cause was denied by the District Court; such certificate was granted by this Court on July 18, 1972; appellant's application for bail pending appeal was denied.

## II.

A brief account of the facts is required to understand appellant's claims and our disposition of this appeal.

Shortly after midnight, April 23, 1964, Mrs. Elba Borrero was assaulted as she returned home from work. Her attacker grabbed her from behind and forced her into an alley. Before the attacker could carry out his expressed intention of killing and raping her, Patrolman Isola of the New York City Police Department arrived and broke up the attack. Officer Isola chased the perpetrator and fired four shots at him, but was not able to apprehend him.

Isola's official police report, his personal notebook, and the first alarm given to police radio cars described Mrs. Borrero's attacker as a male Negro, twenty to twenty-five years old, five feet nine inches tall, weighing 165 pounds. About 7:00 A.M. that same morning, Isola, who had resumed his patrol, came upon Whitmore at a laundromat close to the scene of the Borrero attack. Whitmore was five feet six inches tall, weighed 130 pounds, and had a light complexion and pockmarked face. Although Isola had come within fifteen feet of Mrs. Borrero's attacker and had shone a flashlight at him, he did not then suspect that Whitmore might be that man. Isola asked Whitmore a few questions and then continued on his beat.

Because ten days earlier there had been a rape-murder of one Minnie Edmonds only a few blocks from where Mrs. Borrero was attacked, and because the detective investigating the Edmonds' crime, Detective Aidala, believed there was a similarity between these two crimes, Detective Aidala took over the Borrero case from the detective to whom it had been assigned. Aidala contacted Isola, interviewed Mrs. Borrero, and on April 24, 1964, accompanied by Isola, took Whitmore into custody.

## III.

Whitmore was brought to the police station early that morning. Mrs. Borrero was summoned a few moments later. She viewed Whitmore standing alone in a room and identified him as her assailant.

By midnight of April 24, 1964, after having been in custody for seventeen hours, Whitmore had "confessed"[5] to the Borrero attack, the Edmonds murder, and to the rape-murders of two other young women named Wylie and Hoffert. The charges against Whitmore in the Edmonds case were later dropped.[6] The Wylie-Hoffert confession has since been proved false.[7]

5. In its *Miranda* decision the Supreme Court cited Whitmore's "confession" as an egregious example of the false confessions which can result from custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 455 n. 24, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. Whitmore was tried for the Edmonds murder in April, 1966, after his conviction in the first Borrero trial had been set aside. The trial resulted in a hung jury, and on April 30, 1966, a mistrial was declared. Two months later the Edmonds indictment was dismissed because it was believed that the *Miranda* decision (June 13, 1966) required the retrial of the appellant without the use of certain critical admissions which had been used in the first trial.

7. The Wylie-Hoffert murders, which occurred in Manhattan in August, 1963, attracted nationwide attention. The charges against Whitmore for these murders were dismissed before his second trial in the Borrero case, which occurred in May, 1966. One Richard Robles was

Whitmore's confession in the Borrero case was not used in his third trial on those charges because of a mutual misconception on the part of all the attorneys and the trial justice that Miranda v. Arizona applied to retrials after its effective date.[8]

Without the confession the case against Whitmore rested entirely on the identification of him by Mrs. Borrero. Discrepancies between the first descriptions of the attacker, which do not describe Whitmore and which presumably came from Mrs. Borrero, and Mrs. Borrero's description of the assailant after she had seen Whitmore at the police station, have led appellant to question her identification of him at all three trials.[9] Since this attack on Mrs. Borrero's identification was the heart of his defense, when certain items of "newly discovered evidence" were developed at the identification hearing, Whitmore moved to dismiss the indictment or, in the alternative, for a new trial.

At the identification hearing Mrs. Borrero disclosed that she had actually viewed Whitmore *twice* at the early morning show-up on April 24, 1964. Each of these views was through a peephole into a room in which Whitmore stood alone. For the second, previously unreported viewing, Whitmore was told to wear his hat and coat. Appellant claims that this second show-up was required because Mrs. Borrero did not at first recognize him. Appellant further claims that a guilty verdict would not

have been returned if the jury had known that there had been two show-ups. Appellant believes that this information, together with his other evidence, including the inconsistencies between the first description of the attacker and Mrs. Borrero's later descriptions (which more accurately describe Whitmore) create a strong case against the Borrero identification. Since the State's entire case rested on this identification and since appellant asserts that the second showup was new evidence which would have enabled Whitmore to successfully attack this crucial identification, appellant argues that the New York courts at the very least, should have granted him a new trial. Appellant notes that this additional piece of information might well have led defense counsel to "tell the jury the whole shameful story of the events at the stationhouse on the day of the confessions and of Mrs. Borrero's identification." (Appellant's Reply Brief, p. 4.)

At the identification hearing, Whitmore's attorney also learned that Detective Aidala had interviewed an eyewitness to the attack on Mrs. Borrero. Aidala's notebook contained the following remarks:

Sister-in-law saw he [*sic*] grab me from her window.

(Celeste Viruet . . .) [addresses and phone numbers]

M—Negro

Tan or beige coat—long coat—cloth. No hat. 5'7" or 8"—26 or 7 years.

---

subsequently convicted of these murders. People v. Robles, 27 N.Y.2d 155, 314 N.Y.S.2d 793, 263 N.E.2d 304 (1970).

8. In 1969 the Supreme Court ruled that *Miranda* did not apply to "post-*Miranda* retrials of cases originally tried prior to that decision." Jenkins v. Delaware, 395 U.S. 213, 213–214, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969) (footnotes omitted). *See also*, People v. Sayers, 22 N.Y.2d 571, 293 N.Y.S.2d 769, 240 N.E.2d 540 (1968), cert. denied, 395 U.S. 970, 89 S.Ct. 2107, 23 L.Ed.2d 759 (1969).

9. These descriptions are contained in Patrolman Isola's notebook, in his official report of the incident, in the police blot-

ter, and in the record of the alarm given to police radio cars. They generally agree that the perpetrator weighed about 165 pounds, was from five feet seven to five feet nine inches tall, was between twenty and twenty-seven years old, and was not wearing a hat. Mrs. Borrero denies that she was the source of these descriptions. She now claims that she had originally described the attacker as under five feet seven inches, about 155 pounds with a light complexion and heavily pockmarked face, and wearing a hat. Whitmore had a light complexion and his face is pockmarked. *See* the description by Celeste Viruet in Detective Aidala's notebook *infra*.

This description, if it came from Celeste Viruet,[10] is an independent description which Whitmore claims is favorable to him. Whitmore argues that the Viruet description would have been especially helpful to the defense since it too describes a man, older and taller than Whitmore, who was wearing a long coat and no hat.[11] The claim is made that this evidence would have opened up new lines of attack on Mrs. Borrero's identification of Whitmore. Appellant further claims that he should not have been indicted by a grand jury or convicted by a trial jury which did not have the opportunity to consider the description of an eyewitness, which description, he says, is favorable to him. Appellant charges that New York has "deliberately suppressed" both these items. The result of this "suppression", Whitmore believes, was that he has been denied due process of law and that his petition for a writ of habeas corpus should, therefore, be granted.

### IV.

The "additional" show-up, during which Whitmore wore his coat and hat, occurred only a few minutes after the "first" show-up. There is no evidence that it was Mrs. Borrero who requested that Whitmore don his hat and coat so that she could better identify him; indeed, she testified that she did not make this request. We know that as soon as she caught sight of Whitmore she became frightened and began to cry. It was after she had regained her composure that she viewed the suspect again, this time with his hat and coat on.

■ Appellant's suggestion that Mrs. Borrero must have requested to see Whitmore with his hat and coat because she could not recognize him otherwise is contradicted by the undisputed fact that immediately upon seeing him she said,

"This is the man," and became very distraught. This recognition at the first instant is bolstered by her becoming upset and frightened immediately thereafter. We cannot say that the police in charge of this show-up should have insisted that Mrs. Borrero continue to look through the peephole while Whitmore donned his coat and hat. The "second" viewing occurred between ten and thirty minutes after the "first". Under the circumstances we have no difficulty concluding that there was only one show-up which was understandably interrupted when Mrs. Borrero became upset upon recognizing the man whom she believed, only thirty hours before, had threatened to kill and rape her.

■ And even if we did agree that there were two show-ups here, this fact could not be deemed to be of sufficient import in this case to warrant the granting of the petition sought here. The defense has attacked Mrs. Borrero's identification of Whitmore at three separate jury trials. Appellant places great emphasis on the fact that the initial descriptions of the attacker, which presumably would have come from Mrs. Borrero herself, do not describe Whitmore at all. In addition, appellant points out that while the early descriptions affirmatively state that the attacker was not wearing a hat, Mrs. Borrero later claimed that he was wearing one. Appellant also suggests a possible motive for the apparent changes in Mrs. Borrero's description of her assailant. A reward of $10,000 had been offered for the capture of the Wylie-Hoffert murderer(s). After Mrs. Borrero had identified Whitmore she visited some lawyers to discuss collecting this reward.

■ All of the above, however, has been fully explored in three jury trials and at the identification hearing. It has not persuaded any of those who have con-

10. *See* discussion of the origin of this description *infra*.

11. The definite statement that the attacker was not wearing a hat agrees with the early descriptions of the perpetrator.

*See* n. 9 *supra*. It directly contradicts Mrs. Borrero's testimony. This description is the only one which does not describe the attacker's coat as three-quarter length.

sidered it. We do not believe that the additional knowledge of the "second" show-up could have changed the result in this case. A further reason for refusing to deem this "second" show-up "new evidence" requiring a new trial, a federal evidentiary hearing, or the granting of a petition for a writ of habeas corpus is that all the arguments presented to us now were considered at Justice Helfand's post-trial identification hearing. Whitmore's claim that this is important new evidence was rejected there and appealed and argued to the Appellate Division and the New York Court of Appeals. Having been rejected in each of these courts, this aspect of the case merits no further consideration in the Federal Courts.

## V.

Appellant's claim that the prosecution suppressed evidence of the only eyewitness to the crime is similarly insufficient to warrant any federal interference in his State imprisonment.

From the sketchy reference in Detective Aidala's notebook it *appears* that Mrs. Borrero told Aidala that her sister-in-law had seen the perpetrator grab her. The description that follows the name and address of Celeste Viruet *seems* to indicate that Aidala later talked to her and copied this description from her. This is not clear but it is a fair inference from these sketchy notes. At the identification hearing ordered by the Appellate Division after the third trial some five years after the crime and the investigation, Detective Aidala was not certain that he had talked with Celeste Viruet and gotten that description from her.

Whitmore's attorneys state that they did not know of this eyewitness until the post-trial identification hearing held in April, 1969. The State contends that the existence of the eyewitness was not deliberately kept from defense counsel and that the attorneys who represented

Whitmore in the Edmonds case [12] had Aidala's notebook at that trial and must have noted the reference which counsel now finds so important. Whitmore's present counsel argues that the page on which these notes appear was not available to counsel at the Edmonds trial and that even if it were, it would have been of no interest since there was nothing on that page concerning the Edmonds case.

Appellant's argument here is that Mrs. Borrero's identification could have been better attacked had his attorneys known of this eyewitness. However, regardless of whether Whitmore's attorneys knew about the eyewitness *before* the hearing, they did learn of her *during* that hearing. Appellant had convinced the Appellate Division of the necessity for such a hearing. That was the proper occasion in which to attack the identification of Whitmore by calling the eyewitness to determine what she knew and with whom she had spoken in 1964. No attempt was made to call that witness at the identification hearing.

Justice Helfand found:

The Court finds that Mrs. Borrero would have been able to identify the defendant in Court even if the objectionable procedure in the station house had not been followed. * * * [T]he Court concludes that her in-Court identification was of an independent source and origin and in no way predicated upon the tainted show-up at the station house. * * * There was the unmistakable ring of truth to her testimony. It was direct; it was positive; it was clear and convincing.

Minutes of Hearing, April 8, 1969, at 656–57.

This determination by the trial justice was reviewed in the Appellate Division and argued twice in the Court of Appeals.[13] The same arguments Whit-

---

12. *See* n. 6 *supra.*

13. The case was ordered reargued after the first argument in the New York State

more makes here, he has previously made in each of these courts. The standard of proof at the identification hearing was that the evidence must be "clear and convincing" that the identification was untainted. People v. Ballott, 20 N.Y.2d 600, 606, 286 N.Y.S.2d 1, 6, 233 N.E.2d 103 (1967); People v. Rahming, 26 N.Y.2d 411, 416, 311 N.Y.S.2d 292, 296, 259 N.E.2d 727 (1970).

Query, what was there, if anything, in the Viruet description that could possibly upset this finding and affirmance on appeal?[14] Mrs. Borrero's identification was direct and positive, clear and convincing. Mrs. Viruet had described the attacker as five feet seven inches tall; Whitmore is actually five feet six inches tall. She claimed he was wearing a long coat; Whitmore's coat was a three-quarter length. She said the attacker had no hat; Mrs. Borrero claims there was a hat. The only significant difference at all between the eyewitness description and Whitmore himself concerns the hat. The hat Whitmore was wearing when he was arrested was one which can be worn close to the head so that it might not be easily discerned from a distance at 1:00 A.M. on a dark night.

The description given by this eyewitness does not merit the label "new evidence". It is virtually identical to the other descriptions, except where it better describes Whitmore than these other reports. Thus, even if Whitmore's counsel had not known about the lady in the window, the discovery of her existence after trial does not warrant the granting of a new trial, and denial of such a new trial cannot be seen as a violation of Whitmore's right to due process of law.

VI.

In Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the Supreme Court stated the role of the writ of habeas corpus:

Its root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release. * * * Vindication of due process is precisely its historic office.

372 U.S. at 402, 83 S.Ct. at 829.

Appellant here claims that he has been denied due process because the State suppressed evidence favorable to him and because the State refused to grant him a new trial upon the discovery of "new evidence". The standards for granting petitions for habeas corpus based on allegations of newly discovered evidence are set forth in Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963):

Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.

The Court continues by noting that:

The conventional notion of the kind of newly discovered evidence which will permit the reopening of a judgment is, however, in some respects too limited. * * * If, for any reason not

---

Court of Appeals. The second argument focused on "whether defendant's guilt was established beyond a reasonable doubt as a matter of law." 28 N.Y.2d 587, 319 N.Y.S.2d 620, 268 N.E.2d 331 (1971).

14. A strong dissent was filed by Judge Breitel who believed that the proof was insufficient, as a matter of law, to establish guilt beyond a reasonable doubt. 28 N.Y.2d 826, 322 N.Y.S.2d 65, 270 N.E.2d 893 (1971).

attributable to the inexcusable neglect of petitioner, * * * evidence *crucial* to the adequate consideration of the constitutional claim was not developed at the state hearing, a federal hearing is compelled.

372 U.S. at 317, 83 S.Ct. at 759. (emphasis added)

Neither the second show-up nor the eyewitness qualifies as evidence which "bear[s] upon the *constitutionality* of the applicant's detention". This is obvious with respect to the show-up; it should also be obvious from a reading of the description which the eyewitness gave to Detective Aidala. Analysis of either piece of "new" evidence only provides additional proof of Whitmore's guilt. Neither can be characterized as an item of "evidence crucial to the adequate consideration of the constitutional claim."

■ Appellant also asserts that his petition should be granted because the State deliberately suppressed both items of evidence. In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that:

[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S.Ct. at 1197.

We believe, however, that both of these items of evidence would make the State's case against Whitmore even stronger. Since we are, therefore, not dealing with a case where "evidence favorable to an accused" has been kept from him, we need not consider appellant's claim that the evidence here was suppressed by the prosecution.

In sum, we believe that Judge Bruchhausen acted properly when he denied appellant's petition for a writ of habeas corpus.

The order is affirmed.

MULLIGAN, Circuit Judge (dissenting):

I agree with the majority that the so-called suppression of a second show-up of Whitmore constitutes no basis for federal action here. The State has already conducted a post-trial evidentiary identification hearing at which Mrs. Borrero testified and was cross-examined. There is no new evidence and no suppression.

The alleged suppression of the existence of an eyewitness to the assault on Mrs. Borrero, in my view, presents a compelling ground for the holding of the evidentiary hearing denied the appellant by the court below.

Appellant urges here, as he did in the district court, that it was not until the Spring (March-May) 1969 post-trial evidentiary hearing that counsel for Whitmore ever learned that there was an eyewitness to the assault on Mrs. Borrero. It was then ascertained that Detective Aidala who was in charge of the Minnie Edmonds' murder investigation and took over the Borrero case because of a possible similarity of modus operandi, kept a notebook which indicated that Celeste Viruet, the sister-in-law of the victim, had seen her being grabbed in the early morning of April 23, 1964 while looking out of her apartment window. Counsel for Whitmore in all three Borrero trials have submitted affidavits denying that they ever knew of or were advised of the existence of Celeste Viruet, the silent witness in the window. Celeste Viruet was never called by the State in any of the trials nor has she ever appeared in any evidentiary or other proceeding relating to Whitmore. The State makes no contention that defense counsel was ever specifically advised of the existence of this witness. The State only claims that the notebook of Detective Aidala was made available to counsel for Whitmore when he was being defended on the charge of murdering Minnie Edmonds. The record does not at all establish that even in this other case where counsel's concern was for a different

crime, all pages of the notebook were made available. This is a disputed fact and no evidentiary hearing has ever been conducted on this question in any State proceeding.

In this case Whitmore's guilt ultimately rested solely upon the identification by the victim. The significance therefore of an eyewitness to the crime in the preparation of Whitmore's defense is obvious. See Roviaro v. United States, 353 U.S. 53, 64, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

There are disputed questions of fact here which have never been determined in any State court evidentiary hearing. The existence of Celeste Viruet was disclosed in the Spring, 1969 evidentiary hearing after Whitmore had been convicted. However, the question to be determined in that proceeding was whether the one-man show-up of Whitmore tainted Mrs. Borrero's subsequent in-court identification. Hence, Judge Helfand was not concerned about the role of Celeste Viruet.

> The Court: I permitted you to go far afield about the business of the sister-in-law. I am going to exclude any further questions about it.
>
> She was not a witness before me and whether he interviewed her or did not interview her or she gave him certain information, has some slight bearing on the issues here.
>
> . . . .
>
> Q. Did Mrs. Borrero tell you that her sister-in-law saw—
>
> The Court: No, that is excluded; I don't care what she told her. It is excluded. Now go to something new. Enough about the sister-in-law.
>
> Mr. Beldock: Yes, your Honor.
>
> (Transcript of hearing at 522, 523).

Subsequently, Whitmore moved to dismiss the indictment on the ground of the suppression of this evidence. This motion was denied by Judge Helfand by order dated December 30, 1969, *without*

*a hearing*. Under the circumstances, an evidentiary hearing is mandated in the federal district court:

> Where the facts are in dispute, the federal court on habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.
>
> Townsend v. Sain, 372 U.S. 293, 312–313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963) (footnote omitted); see 28 U.S.C. § 2254(d).

The majority here seeks to avoid Townsend v. Sain by finding that the new evidence of the eyewitness does not bear upon "the constitutionality" of Whitmore's detention nor is it "crucial" since in any event her testimony would not help Whitmore but would in fact strengthen the State's case against him. Neither proposition is tenable. The claim here is not that the defendant didn't know about an eyewitness to the crime but rather that the State knew and deliberately suppressed and concealed her existence from the defense. This is unquestionably of constitutional magnitude. Brady v. Maryland, 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The argument of the State adopted by the majority here that we can disregard Celeste Viruet's existence because her testimony would have only hurt the defense and helped the State, has to be rejected. The description in Aidala's notebook while not accurately describing Whitmore, has only the virtue of being more accurate than that contained in the original police alarm which was presumably supplied by Mrs. Borrero. We don't even know for sure if the description in the book was supplied by Celeste Viruet since Aidala wasn't positive that

he had even interviewed her.* In any event what the lady in the window saw and what she might testify to, is not known since she has never appeared in any proceeding to date. The fact that there was another eyewitness not called by the State in a case which in substance depended primarily upon Mrs. Borrero's identification of her assailant, cannot be disregarded.

Having taken a position that the evidence of Celeste Viruet would be somehow "favorable" to the State, the majority concludes "we need not consider appellant's claim that the evidence here was suppressed by the prosecution." However, a federal court's task is to determine both materiality of the evidence and whether its suppression was intentional or inadvertent. United States v. Keogh, 391 F.2d 138, 146–148 (2d Cir. 1968) and 440 F.2d 737, 741 (2d Cir.), cert. denied, 404 U.S. 941, 92 S.Ct. 285, 30 L.Ed.2d 254 (1971). Neither factor can be ascertained here without an evidentiary hearing.

## PETITION FOR REHEARING EN BANC GRANTED

A petition for rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for the appellant, and a majority of the judges in active service having voted in favor of such rehearing,

It is hereby

Ordered that said petition be and it hereby is granted. Reconsideration will be had, without further oral argument, on the record and on the briefs heretofore filed and to be filed. The parties are requested to file further briefs on or before March 16, 1973, addressed, but not limited, to the progress of the investigation presently being conducted by the Kings County District Attorney.

---

\* Mr. Beldock: That's the description you got from the sister-in-law who saw this happen from the window; right?

## ORDER

It is hereby ordered that the motion made herein by Myron Beldock, Esq., counsel for the relator-appellant in the form of a letter dated April 10, 1973 is granted, the district court's order denying the petition for habeas corpus is vacated, and the appeal is dismissed as moot.

Det. Aidala: Oh, that's possible. It might be from the sister-in-law. You could be right there, Counsellor.

(Transcript of Hearing at 508–09.)