OPINION OF THE COURT
Aileen Haas Schwartz, J.
No more vexing issue confronts the court in a criminal or juvenile delinquency proceeding than the reliability of eyewitness identification. "The vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification”, the Supreme Court observed in United States v Wade (388 US 218, 228).
The challenge to the admissibility of identification evidence in the instant case poses an additional threshold problem: Does the standard enunciated in Manson v Brathwaite (432 US 98) govern or does New York law mandate a more protective due process test, to wit, the so-called "per se exclusionary rule” regarding a pretrial confrontation?
To turn to the factual background: On the evening of April 6, 1978, at about 9 o’clock, three youths robbed the complainant, an older woman, in the "outer vestibule” of a building in the Stuyvesant Town complex in which she lived. One of the youths pushed her to the wall causing her to lose her balance and fall to the ground. The youths fled when another tenant entered the building. None of the youths had been known to the complainant prior to the incident.
Respondent challenged the proffered testimony of identification at a pretrial confrontation and in the courtroom as violative of the constitutional right to due process under the Stovall v Denno (388 US 293) standard. The ensuing hearing *735 on the issue of admissibility of each of the aspects of identification evidence forms the subject of this opinion-decision.
Complainant testified that someone entered the outer vestibule in which she was present and inquired, "Lady, do you live here?” She turned to face the speaker in the bright fluorescent-lighted vestibule and saw a Black youth who then departed. Moments later the youth returned with two other Black youths. The first youth spoke again, announcing, "This is a robbery. This is a hold up. Give us your wallet.” Complainant responded that she had no wallet. The first youth twice repeated his statement. As she stood facing the youths, they started to "close in” on her. She recalled that she had some change in her pocket, "about a dollar’s worth”, and she threw the change to the ground. The first youth and another youth "went down to pick up the change.” The third youth, the oldest of the three, continued toward her and pushed her until she fell to the ground. A tenant then entered the building, and the youths fled.
Complainant estimated that the encounter lasted from 10 to 15 minutes. She stated she saw the youths clearly: She estimated their ages ranged from 9 to about 12 years. The first youth was the youngest. The youngest was about 4 feet 6 inches tall; the second youth was about 4 feet 10 inches tall; the oldest youth was about 5 feet 2 to 3 inches tall. The two youngest youths wore tan jackets, and the oldest youth, a blue denim jacket.
After the incident, she went to a neighbor’s apartment and telephoned the police department, "911”, and the "security office” in the building and furnished descriptions of the youths consistent with her testimony. At approximately 9:30, she was advised that some youths had been apprehended and she was brought to the carriage room of the building to observe five youths, three of whom were Black youths. She identified the three Black youths without hesitation. The three youths wore the jackets she had described. There was no dispute that complainant claimed respondent to be "the first youth.”
One of the two police officers who responded to the report of the incident testified: Although the security guards had apprehended the five youths before the police arrived, the police were in charge of the identification procedures. Complainant was advised by the testifying police officer that she was to view some people "supposedly involved in the robbery on her.” That police officer described the five youths as three Black *736 youths, one white youth and one "mulatto”, and he estimated that the three Black youths’ heights ranged from five feet to five feet two or four inches. The arrest reports indicate that the second and not the oldest youth was the tallest. Their ages ranged from 14 to older than 16. Two youths wore tan jackets, the respondent and the oldest youth; the other youth wore a "blue jeans” jacket. Complainant, according to the police officer, identified each of the three youths in turn without hesitation.
To turn to the threshold issue, does Manson v Brathwaite (432 US 98, supra), represent the New York standard governing respondent’s application to suppress evidence of the pretrial and in-court identifications?
Manson v Brathwaite (supra, p 106) held that "the admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability.” In so holding, the court resolved the controversy that had ensued in the wake of the Wade-Gilbert-Stovall trilogy, and more particularly, the due process rule enunciated in Stovall v Denno (388 US 293, supra).
United States v Wade (388 US 218, supra), Gilbert v California (388 US 263) and Stovall v Denno (388 US 293, supra)— the Wade-Gilbert-Stovall trilogy — formulated a major blueprint designed to vindicate the individual’s right to a fair trial and to safeguard the integrity of the judicial process against the corrosive effect of suggestive confrontation procedures. The Supreme Court recognized that "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.” (United States v Wade, supra, p 228.) Indeed, the Supreme Court reasoned (United States v Wade, supra, pp 235-236), "The trial which might determine the accused’s fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness — 'that’s the man’.” Therefore, the court held (p 237) that "the post-indictment lineup was a critical stage of the prosecution at which *737 [Wade] was 'as much entitled to such aid [of counsel] . . . as at the trial itself.”
The Wade case involved an in-court identification of the accused by witnesses who attended the lineup adjudged violative of the accused’s Sixth Amendment right to counsel. Such courtroom identification would be admissible, the Supreme Court held, only upon the Government’s proof "established] by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification.” (United States v Wade, supra, p 240.) Gilbert v California (supra) involved courtroom identification subject to the Wade proscription and testimony of identification at a postindictment pretrial lineup violative of the right to counsel. The Supreme Court in Gilbert v California adopted a per se exclusionary rule for evidence of such pretrial identification, reasoning, "Only a per se exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused’s constitutional right to the presence of his counsel at the critical lineup.” (388 US 263, 273, supra.)
Stovall v Denno (supra) concerned a pretrial confrontation conducted in the absence of counsel after "[a]n arraignment [had been] promptly held but was postponed until petitioner could retain counsel.” (388 US 293, 295.) The court held that the Wade and Gilbert rules would not be afforded retroactive effect. Although such protective aegis of the Sixth Amendment right to counsel was not available to Stovall, the court recognized that the fundamental constitutional interest implicated by suggestive pretrial confrontation was due process. Thus, the court considered whether "the confrontation conducted in this case was so unnecessarily suggestive and conductive to irreparable mistaken identification that [Stovall] was denied due process of law.” (388 US 293, 301-302.) Manifestly, the showing of Stovall to the victim in her hospital room was suggestive. Stovall "was handcuffed to one of five police officers who, with two members of the staff of the District Attorney, brought him to the hospital room. [Stovall] was the only Negro in the room.” (388 US 293, 295.) Nevertheless, the Supreme Court did not find the suggestive confrontation violative of due process, reasoning, "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall *738 to Mrs. Behrendt in an immediate hospital confrontation was imperative.” (388 US 293, 302.)
Notwithstanding that the comprehensive opinions in the Wade-Gilbert-Stovall cases reflect painstaking evaluation of the many competing considerations in reaching the court’s conclusions, application of the standards revealed apparently still unresolved facets of the trilogy’s exclusionary rules.
Two main areas of conflicting interpretations emerged: (1) Did the Wade-Gilbert right to counsel attach to confrontations held prior to commencement of judicial criminal proceedings? (2) What was the scope of the Stovall due process protection?
Kirby v Illinois (406 US 682) provided a definitive answer to the first question: The Sixth Amendment right to counsel attaches at the "initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.” (406 US 682, 689.) The Supreme Court declined to depart from the traditional view of the constitutional right to counsel and to expand the right to a confrontation stage prior to the initiation of judicial criminal proceedings. Mr. Justice Brennan who had written the opinions for the court in Wade, Gilbert and Stovall dissented in an opinion in which Mr. Justice Douglas and Mr. Justice Marshall joined. The Brennan opinion emphasized with inexorable logic that "there inhere in a confrontation for identification conducted after arrest the identical hazards to a fair trial that inhere in such a confrontation conducted 'after the onset of formal prosecutorial proceedings’.” (406 US 682, 697-698.) Wade, according to the Brennan dissenting opinion, vindicated the accused’s due process right to a fair trial and hence the magnitude of Wade’s protective aegis was not circumscribed by the lesser inclusive traditional Sixth Amendment right to counsel. Parenthetically, it is noted that far less cogent is the dissenting opinion’s argument that the Stovall fact pattern would fall outside the purview of the "formal charge” standard of the plurality opinion. (406 US 682, 701-703.)
New York law had adopted the more expansive interpretation of the Wade-Gilbert standards. As explained by the New York Court of Appeals in People v Blake (35 NY2d 331, 336), "Prior to the Kirby case, this court, acting under what was logically considered to be the constraint of the Wade-Gilbert rules, accepted, without further analysis, their application to prearraignment viewings”. Subsequent to Kirby v Illinois *739 (supra), the Court of Appeals in People v Blake (supra) independently evaluated the necessity of mandating, under the State Constitution, the presence of counsel at a stage earlier than that required by the United States Constitution. Countervailing pragmatic considerations supported by an empiracal analysis of New York cases during the some seven years since the Wade-Gilbert decisions impelled the Court of Appeals to follow the Federal standard and to hold that the traditional scope of the right to counsel in New York would govern the Wade-Gilbert rules. See, as to right to counsel in New York, People v Settles (46 NY2d 154).
Clearly, Kirby v Illinois (supra), and in New York, People v Blake (supra), enhanced the significance of the due process test enunciated in Stoval v Denno (supra). (See Kirby v Illinois, 406 US 682, 690-691.) Paradoxically, Stovall v Denno (supra) engendered a jurisprudential dichotomy regarding the very nature of its due process pronouncement, and the conflict eluded definitive resolution for some 10 years until Manson v Brathwaite (432 US 98).
Manson v Brathwaite involved a post -Stovall confrontation procedure that was impermissibly suggestive and unnecessarily conducted in that manner, to wit, the showing of a single photograph. The reasoning in the opinion of the Supreme Court per Mr. Justice Blackmun in Manson v Brathwaite (supra) and that of Judge Friendly for the Court of Appeals for the Second Circuit (527 F2d 363) exemplify the divergent views. Succinctly stated, the view espoused by Judge Friendly (p 371) prescribed a per se exclusionary rule: "Evidence of an identification unnecessarily obtained by impermissibly suggestive means must be excluded under Stovall”. The Supreme Court rejected the per se exclusionary rule in favor of an ad hoc approach to test "the reliability of the identification under the totality of the circumstances.” "The standard, after all,” the Supreme Court explained (432 US 98, 113), "is that of fairness as required by the Due Process Clause of the Fourteenth Amendment. [Citations omitted.] Stovall, with its reference to 'the totality of the circumstances,’ [citation omitted] and Biggers, with its continuing stress on the same totality [citation omitted], did not, singly or together, establish a strict exclusionary rule or new standard of due process.”
Manson v Brathwaite (supra) represents the culmination of a series of cases that strove to distill the essence of the Stovall due process standard. From Simmons v United States (390 US *740 377), decided in 1968, through Neil v Biggers (409 US 188), to Manson v Brathwaite (supra), the decisions, albeit by a divided court, constitute a consistent evolution of the principle of adherence to the traditional due process concept. Indeed, in announcing the governing standard, the court in Manson v Brathwaite (432 US 98, 114) explicitly adopted the Neil v Biggers test which in turn had relied upon Simmons v United States (supra): "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post -Stovall confrontations. The factors to be considered are set out in Biggers. [Citation omitted.] These include the opportunity of the witness to view the criminal at the time of the crime, the witness’s degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.”
Although the post -Stovall opinions are couched in terms of the nature and scope of the due process protection, review of the opinions reveals the attitude toward a per se exclusionary rule to be the critical consideration. It will be recalled that the one sentence concurring opinion of Mr. Justice Powell in Kirby v Illinois (406 US 682, 691, supra) reads, "As I would not extend the Wade-Gilbert per se exclusionary rule, I concur in the result reached by the Court.” Mr. Justice Powell in the opinion for the court in Neil v Biggers (409 US 188, 199, supra) wrote: "The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process.” Proponents of the per se exclusionary rule did not contest that premise. Rather did the Court of Appeals for the Second Circuit urge (Brathwaite v Manson, 527 F2d 363, 371, supra), "No rules less stringent than these can force police administrators and prosecutors to adopt procedures that will give fair assurance against the awful risks of misidentification.”
In Manson v Brathwaite (432 US 98, 112-113, supra) the court discussed the "serious drawbacks” of a per se exclusionary rule upon "the administration of justice”, and concluded, "Certainly, inflexible rules of exclusion, that may frustrate *741 rather than promote justice, have not been viewed recently by this Court with unlimited enthusiasm.” Even more recently, the Supreme Court stated in Rakas v Illinois (439 US 128), "Each time the exclusionary rule is applied it exacts a substantial social cost * * *. Relevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected.” Of particular significance, the Supreme Court in Manson v Brathwaite noted that a Stovall per se exclusionary rule would not serve to vindicate a constitutionally protected interest, contrasted with the Sixth Amendment right to counsel interest in Wade, but only an evidentiary interest. (432 US 98, 113, supra, citing favorably the reasoning of Judge Leventhal in Clemons v United States, 408 F2d 1230, 1251, cert den 394 US 964; Neil v Biggers, 409 US 188, 199, supra.)
Commentators who, in the words of the dissenting opinion of Mr. Justice Marshall in Manson v Brathwaite (432 US 98, 124, supra), "mourned the demise of Stovall in the Biggers decision”, pointed to a change in focus from the propriety or impropriety of police-conducted identification procedure to the resultant likelihood of misidentification. The analyses would appear to be accurate.
Consonant with traditional jurisprudence, Manson v Brathwaite recognized the primary responsibility of the Judge to guard against evidentiary infection that would prove fatal to the innocent. No less sensitive to the special problems inherent in eyewitness identification, the court prescribed explicit guidelines to safeguard the individual against the danger of misidentification.
The Lord Chief Justice of England, Lord Widgery, in a 1976 opinion on the subject of identification evidence, articulated virtually the very same views in rejecting an inflexible rule "that no person could be convicted on evidence of visual identification alone” in favor of a standard testing the quality of the evidence under all the circumstances. (Regina v Turnbull [1977], QB 224.) "Were the courts to adjudge otherwise”, the Lord Chief Justice wrote, "affronts to justice would frequently occur.” (Regina v Turnbull [1977], QB 224, 229, supra.) The significance of the standard prescribed by the English Court of Appeal, Criminal Division, becomes clear when viewed in the context of the problem addressed by the court. A few cases of miscarriage of justice had occurred in recent years as the result of inaccurate visual identification. On May *742 1, 1974, the Home Secretary appointed a committee, Lord Devlin as chairman, to review "all aspects of the law and procedure relating to evidence of identification in criminal cases; and to make recommendations.” (Devlin, Report of the Departmental Committee on Evidence of Identification in Criminal Cases VII.) That report was before the English Court of Appeal. The standards prescribed by the English court thus constituted the judicial response to the problems of evidence of identification. As noted in the opinion, the court "tried to follow the recommendations set out in the Report which Lord Devlin’s Committee made” and did so for the most part, but the court rejected the recommendation for an inflexible standard as a "fetter on the administration of justice.” ([1977] QB 224, 231, supra.) "Quality is what matters in the end,” the court stated in language and substance akin to the reliability test of the Supreme Court (p 231).
Contrasted with the New York Court of Appeals response to Kirby v Illinois (406 US 682, supra), there has been no definitive statement by that court addressing the per se exclusionary rule versus the "reliability under the totality of the circumstances” rule debate subsequent to Manson v Brathwaite (supra). In our Federal system, a State may provide a more comprehensive constitutional protective standard than that required by the Supreme Court. "Each State has power to impose higher standards governing police practices under state law than is required by the Federal Constitution.” (Brennan, J., dissenting in Michigan v Mosley, 423 US 96, 120.) People v Blake (35 NY2d 231, supra) is instructive not only in its specific holding on the Wade-Gilbert right to counsel standard but in its comprehensive statement of the pragmatic difficulties concomitant to implementation of the more inclusive standard and the consequential development of a body of decisional exceptions. Indeed, the stated rationale for adoption of the narrower Federal rule harked back to the discussion of the competing interests first identified and weighed in the Wade opinion. The Wade court, it will be recalled, expressly envisaged future re-evaluation of the right to counsel standard as the judicial remedy to "eliminate the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial.” (388 US 218, 239, supra.) "What we hold today,” the court continued, " 'in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it *743 intended to have this effect.’ ” Some seven years after the Wade decision, the New York Court of Appeals independently struck a balance of the competing interests at stake and narrowed New York’s earlier standard with its attendant per se exclusionary rule.
Analysis of the New York cases indicates a like preference for an ad hoc "reliability under a totality of the circumstances” approach to the Stovall due process standard. Granted, the cases do not articulate a fixed juridical doctrine defining the New York standard. (See, e.g., People v Vereen, 45 NY2d 856; People v Marrero, 44 NY2d 675; People v Gruttola, 43 NY2d 116; People v Ramos, 42 NY2d 834; People v Reeves, 39 NY2d 1047; People v Blake, 35 NY2d 331, supra; People v Carter, 30 NY2d 279; People v Harrington, 29 NY2d 498; People v Whitmore, 28 NY2d 826; People v Branch, 27 NY2d 834; People v Ganci, 27 NY2d 418; People v Gonzalez, 27 NY2d 53; People v Rahming, 26 NY2d 411; People v Logan, 25 NY2d 184; People v Brown, 20 NY2d 238; People v Ballott, 20 NY2d 600.) The Court of Appeals in People v Logan (25 NY2d 184, 191, supra), however, did recognize the "totality of the circumstances” factor as an essential dimension of the Stovall standard. People v Logan (supra) remains a much cited case. Parenthetically, it is noted that People v Logan (supra) relied upon post-Stovall decisions of the Supreme Court that characterize fairness under the totality of the circumstances as the essence of the test and further, People v Logan (25 NY2d 184, 192, supra) discussed the pretrial identification evidence in Biggers v Tennessee (390 US 404), in which the conviction was affirmed by an equally divided Supreme Court. The Biggers case came before the Supreme Court again in Neil v Biggers (supra). Indeed, notwithstanding other New York decisions seeming to apply a per se exclusionary standard, People v Logan (supra), in language and substance represents the "reliability under the totality of the circumstances” approach as later enunciated in Manson v Brathwaite (supra).
Manson v Brathwaite (supra) is thus deemed to govern the matter now before this court.
Application of the Stovall due process standard as clarified by Manson v Brathwaite (supra) compels denial of the motion to suppress evidence of the challenged pretrial identification and hence, of the in-court identification. Granted, the confrontation procedure adopted by the police officers in the *744 instant matter was suggestive and unnecessarily conducted in that fashion. Those factors do not conclude but rather mark the need for further judicial evaluation. Applying the Manson v Brathwaite (432 US 98, 114-115, supra) criteria:
(1) "The opportunity to view.” Complainant saw each of the youths in a bright flourescent light at close proximity for a period of between 5 to 10 minutes. She saw the first youth on two occasions, and it was he who addressed her on both occasions.
(2) "The degree of attention.” Although complainant admitted she was in a state of shock, she testified she looked directly at the youths at all times and remained alert to minimize the danger posed to her.
(3) "The accuracy of the description.” With the exception of the complainant’s patent inability to guage the youths’ ages exactly and her correlation of size with age, her descriptions were sound, albeit sketchy.
(4) "The witness’ level of certainty.” According to the police officer, complainant was positive in her identification and acted without hesitation. Her testimony demonstrated a high degree of certainty of the identity of each of the three youths, particularly "the first youth”. It is noted that the police officer improperly advised complainant she was to view persons "supposedly involved in the robbery on her.” A similar impropriety was not deemed to render the identification inadmissible in Neil v Biggers (409 US 188, 196, supra) or in People v Logan (25 NY2d 184, 192, supra).
(5) "The time between the crime and the confrontation.” The confrontation took place within 30 to 45 minutes after the crime.
In the words of Manson v Brathwaite (432 US 98, 116, supra), the above "indicators of [complainant’s] ability to make an accurate identification are hardly outweighed by the corrupting effect of the challenged identification itself.” Weighing all the factors, the evidence does not permit the finding of " 'a very substantial likelihood of irreparable misidentification.’ ” (Manson v Brathwaite, supra, p 116.) Rather does the evidence establish the reliability of the pretrial identification: the identification emanated from the complainant’s observations at the time of the crime and not from the suggestive confrontation procedure.
*745 The respondent has failed to sustain his burden of proof, and the motion to suppress is denied in its entirety.